PATRICIA H. BENSON (SBN 60565)
  phb@msk.com
MARC E. MAYER (SBN 190969)
  mem@msk.com
NAOMI STRAUS (SBN 287804)
  nxs@msk.com
MITCHELL SILBERBERG & KNUPP LLP
11377 West Olympic Boulevard
Los Angeles, CA  90064-1683
Telephone:   (310) 312-2000
Facsimile:    (310) 312-3100

Attorneys for Plaintiff
Activision Publishing, Inc.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ACTIVISION PUBLISHING, INC., a Delaware Corporation,<br><br>                 Plaintiff,<br><br>        v.<br><br>ACTIVISION TV, INC., a Delaware Corporation; AD MEDIA DISPLAYS, INC., a Wyoming Corporation; DAVID GOTHARD, an individual,<br><br>                 Defendants. | CASE NO. CV12-8964-GW (JEMx)<br><br>Honorable George H. Wu<br><br>**NOTICE OF MOTION AND MOTION OF PLAINTIFF ACTIVISION PUBLISHING, INC. FOR PARTIAL SUMMARY JUDGMENT ON FIRST, SECOND, FOURTH AND SIXTH CLAIMS FOR RELIEF;**<br><br>**DECLARATIONS OF JON ESTANISLAO, DAVID OXFORD, TERRY KIEL, DAVID TEITELBAUM, JAMES BERKLEY, AND MARC E. MAYER FILED HEREWITH**<br><br>**SEPARATE STATEMENT OF UNDISPUTED FACTS AND [PROPOSED] ORDER LODGED HEREWITH**<br><br>Date:      July 1, 2013<br>Time:     8:30 a.m.<br>Ctrm:     10 |

**REDACTED PUBLIC VERSION**

Mitchell
Silberberg &
Knupp LLP

5350007.1

---

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

## TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

**PLEASE TAKE NOTICE THAT** on July 1, 2013, at 8:30 a.m., or as soon as the matter may be heard in the courtroom of the Honorable George H. Wu, plaintiff Activision Publishing, Inc. ("Activision") will and hereby does move the court pursuant to Fed. R. Civ. P. 56 for partial summary judgment as to liability on its First, Second, Fourth, and Sixth Claims for Relief against defendants Activision TV, Inc.; Ad Media Displays, Inc.; and David Gothard, for Trademark Infringement, False Designation of Origin, Unfair Competition, and Declaratory Relief.

The basis for this Motion is that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law for the following reasons:

1.     Activision is entitled to summary judgment on its First, Second, and Fourth Claims for Relief on the grounds that Defendants have knowingly appropriated Activision's registered trademark and has used it in a way likely to cause confusion as to the source or sponsorship of Defendants' products. Specifically, all of the factors set forth in the test articulated in AMF Inc. v. Sleekcraft Boats, 599 F.2d 341, 348-49 (9th Cir. 1979), weigh in favor of a finding of likelihood of confusion.

2.     Activision is entitled to summary judgment on its Sixth Claim for Declaratory Relief.  Specifically, the Court should declare that Defendants' pending trademark applications (Serial Nos. 85/143756; 77/912745; 77/827404; and 77/978,580) are to be denied registration because Defendants' proposed

1  trademark "so resembles" a registered mark or a prior common-law mark or trade

2  name that it is likely to cause confusion.  15 U.S.C. § 1052(d).

3

4      This Motion is based on this Notice of Motion and Motion, the

5  accompanying Memorandum of Points and Authorities, the Separate Statement of

6  Undisputed Facts and Conclusions of Law lodged concurrently herewith, the

7  Declarations of Jon Estanislao, David Oxford, Terry Kiel, David Teitelbaum, Marc

8  Mayer, and James Berkley, and any papers and pleadings on file herewith.

9

10     This Motion is made following multiple conferences with counsel, including

11  conferences that took place on April 18, 2013, and May 22, 2013.

12

13  DATED: June 3, 2013              PATRICIA H. BENSON
                                     MARC E. MAYER
14                                   NAOMI STRAUS
                                     MITCHELL SILBERBERG & KNUPP LLP
15

16

17                                   By:    /s/ Marc E. Mayer
                                            Marc E. Mayer
18                                          Attorneys for Plaintiff
                                            Activision Publishing, Inc.
19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

Introduction ...................................................................................................... 1

I.    STATEMENT OF UNDISPUTED FACTS. ................................................ 2

    A.    Plaintiff Activision Publishing, Inc. ..................................................... 2

    B.    The Defendants And Their Business. ..................................................... 5

    C.    Procedural History ................................................................................ 10

II.    THE LEGAL STANDARD. .................................................................... 10

III.    ACTIVISION IS ENTITLED TO SUMMARY JUDGMENT ON ITS
FIRST, SECOND, AND FOURTH CLAIMS FOR RELIEF ...................... 11

    A.    Activision Has Used the ACTIVISION Mark For Over 30 Years. ..... 11

    B.    Defendants' Use of the ACTIVISION Mark Causes And Is Likely
To Cause Confusion. ............................................................................ 12

    C.    Each Of The *Sleekcraft* Factors Weighs Heavily In Favor Of A
Likelihood of Confusion. ..................................................................... 14

        1.    Defendants' Admitted Intent To Trade On Activision's
Goodwill Is Highly Probative Of Consumer Confusion. ......... 15

        2.    Plaintiff's ACTIVISION Mark Has Great Conceptual and
Marketplace Strength. .............................................................. 16

        3.    The Marks Are Identical In Sight, Sound, and Meaning .......... 18

        4.    The Parties' Goods Are Closely and Logically Related ........... 19

        5.    Defendants Intend To Expand Into Plaintiff's Market. ............ 21

        6.    Actual Confusion Already Is Apparent. ................................... 22

        7.    The Parties Use The Same Or Similar Marketing Channels. .... 23

        8.    Degree Of Care. ........................................................................ 23

Mitchell
Silberberg &
Knupp LLP

5350007.1

iii

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

1

## **TABLE OF CONTENTS**
## <u>(continued)</u>

<u>**Page**</u>

IV.    ACTIVISION IS ENTITLED TO SUMMARY JUDGMENT ON ITS
       SIXTH CLAIM FOR DECLARATORY RELIEF. .......................................24

Conclusion ............................................................................................................25

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Mitchell
Silberberg &
Knupp LLP

5350007.1

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

Acad. of Motion Picture Arts & Sciences v. Creative House Promotions, Inc.,
    944 F.2d 1446 (9th Cir. 1991) ................................................................11, 13, 22

AMF Inc. v. Sleekcraft Boats,
    599 F.2d 341 (9th Cir. 1979) ............................................................2, 14, 15, 21

Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.,
    457 F.3d 1062 (9th Cir. 2006) ............................................................... 10

Beacon Mut. Ins. Co. v. OneBeacon Ins. Group,
    376 F.3d 8 (1st Cir. 2004) ...................................................................... 13

Brookfield Communications, Inc. v. West Coast Entm't Corp.,
    174 F.3d 1036 (9th Cir. 1999) ..........................................................*passim*

CAE, Inc. v. Clean Air Engineering, Inc.,
    267 F.3d 660 (7th Cir. 2001) .................................................................. 24

Conversive, Inc. v. Conversagent, Inc.,
    433 F. Supp. 2d 1079 (C.D. Cal. 2006)................................................... 17

Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.,
    109 F.3d 1394 (9th Cir. 1997) ............................................................... 14

Dreamwerks Prod. Grp., Inc. v. SKG Studio,
    142 F.3d 1127 (9th Cir. 1998)........................................................11, 12, 18, 19

E & J Gallo Winery v. Consorzio del Gallo Nero,
    782 F. Supp. 457 (N.D. Cal. 1991)...................................................17, 19

E. & J. Gallo Winery v. Gallo Cattle Co.,
    967 F.2d 1280 (9th Cir. 1992) ............................................................... 14

Electropix v. Liberty Livewire Corp.,
    178 F. Supp. 2d 1125 (C.D. Cal. 2001)............................................18, 19

Elvis Presley Enters., Inc. v. Capece,
    141 F.3d 188 (5th Cir. 1998)................................................................. 13

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

Ferrari S.p.A. Esercizio Fabbriche Automobilie Corse v. McBurnie,
    11 U.S.P.Q.2d 1843, 1989 WL 298658 (S.D. Cal. June 1, 1989)..................... 12

GoTo.com, Inc. v. Walt Disney Co.,
    202 F.3d 1199 (9th Cir. 2000) .................................................................... 16, 17

Grey v. Campbell Soup Co.,
    650 F. Supp. 1166 (C.D. Cal. 1986)
    aff'd, 830 F.2d 197 (9th Cir. 1987) .................................................................. 12

In re Artic Electronics Co., Ltd.,
    220 U.S.P.Q. 836, 1983 WL 51896 (T.T.A.B. 1983) ................................. 13, 24

In re Emulex Corp.,
    6 U.S.P.Q.2d 1312, 1987 WL 124024 (T.T.A.B. 1987) .................................. 20

In re Graphics Technology Corp.,
    222 U.S.P.Q. 179, 1984 WL 63029 (T.T.A.B. 1984) ...................................... 19

In re TIE/Communications, Inc.,
    5 U.S.P.Q.2d 1457, 1987 WL 123872 (T.T.A.B. 1987) .................................. 20

In re Total Quality Group Inc.,
    51 U.S.P.Q. 2d 1474, 1999 WL 588248 (T.T.A.B. 1999) ............................... 24

In re White Swan Ltd.,
    8 U.S.P.Q.2d 1534, 1988 WL 252416 (T.T.A.B. 1988) .................................. 18

Interstellar Starship Services, Ltd. v. Epix Inc.,
    184 F.3d 1107 (9th Cir. 1999) ........................................................................ 15

Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery,
    150 F.3d 1042 (9th Cir. 1998) ........................................................................ 16

Lambda Electronics Corp. v. Lambda Technology, Inc.,
    515 F. Supp. 915 (S.D.N.Y. 1981) ................................................................. 20

Little Caesar Enters., Inc. v. Pizza Caesar, Inc.,
    834 F.2d 568 (6th Cir. 1987) .......................................................................... 15

Mitchell
Silberberg &
Knupp LLP

5350007.1

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

1

**TABLE OF AUTHORITIES**
(continued)

2

3

**Page(s)**

4

Mobil Oil Corp. v. Pegasus Petroleum Corp.,
   818 F.2d 254 (2d Cir. 1987) .......................................................................... 13

5

Mortgage Elec. Registration Sys., Inc. v. Brosnan,
   No. C 09-3600 SBA, 2009 WL 3647125 at *7 (N.D. Cal. Sept. 4, 2009) ......... 15

6

7

New West Corp. v. NYM Co.,
   595 F.2d 1194 (9th Cir. 1971) ...................................................................... 11

8

9

Nissan Motor Co. v. Nissan Computer Corp.,
   378 F.3d 1002 (9th Cir. 2004) ............................................................... 10, 13

10

11

Octocom Sys., Inc. v. Houston Computer Servs., Inc.,
   918 F.2d 937 (Fed. Cir. 1990) ...................................................................... 19

12

13

Official Airline Guides, Inc. v. Goss,
   6 F.3d 1385 (9th Cir. 1993) .................................................................... 15, 23

14

15

Playboy Enters., Inc. v. Netscape Communications Corp.,
   354 F.3d 1020 (9th Cir. 2004) ...................................................................... 15

16

Quigley v. Guvera IP Pty Ltd.,
   No. C 10-03569 CRB, 2010 WL 5300867 (N.D. Cal. Dec. 20, 2010) ............. 16

17

18

Safety-Kleen Corp. v. Dresser Indus., Inc.,
   518 F.2d 1399 (C.C.P.A. 1975) .................................................................... 19

19

20

San Fernando Electric Mfg. v. JFD Electric Components Corp.,
   565 F.2d 683 (C.C.P.A. 1988) ...................................................................... 23

21

22

Sega Enters. Ltd. v. MAPHIA,
   948 F. Supp. 923 (N.D. Cal. 1996) ............................................................... 14

23

24

Sengoku Works Ltd. v. RMC Int'l, Ltd.,
   96 F.3d 1217 (9th Cir. 1996) .................................................................. 11, 12

25

26

SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.,
   846 F. Supp. 2d 1063 (N.D. Cal. 2012) ....................................... 16, 19, 21, 23

27

28

Mitchell
Silberberg &
Knupp LLP

5350007.1

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

U. S. Jaycees v. San Francisco Jr. Chamber of Commerce,
354 F. Supp. 61 (N.D. Cal. 1972)
aff'd, 513 F.2d 1226 (9th Cir. 1975) ................................................................ 10

UGG Holdings, Inc. v. Severn,
No. CV04-1137-JFW, 2005 WL 5887187 (C.D. Cal. Feb. 23, 2005) .............. 17

Westchester Media v. PRL USA Holdings, Inc.,
214 F. 3d 658 (5th Cir. 2000) ........................................................................... 22

**STATUTES**

15 U.S.C. (Lanham Act) ............................................................................. 22, 24
§ 1052(d) ................................................................................................. 24
§ 1115 ....................................................................................................... 11
§ 1119 ....................................................................................................... 24

**OTHER AUTHORITIES**

4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition
(4th ed. 2013) ............................................................................................. 20, 24

Mitchell
Silberberg &
Knupp LLP

5350007.1

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

### Introduction

Plaintiff Activision Publishing, Inc. ("Activision") is one of the world's largest and most renowned video and computer game companies.  Activision has brought this lawsuit to end Defendants' deliberate misappropriation of its well-known, 30-year old, ACTIVISION brand and corporate name.  Defendants are an individual and two corporations that purport to make and distribute an interactive television and multimedia system that they claim gives users access to on-demand video games, movies, the Internet, and a host of other services.

Defendants' documents and testimony are rife with damning admissions, including that (1) they selected the ACTIVISION name after being cautioned by their attorney of Activision's preexisting rights; (2) they knew their investors were confused about their relationship with Activision; (3) they recognized that their use of the name created "noise and possible confusion" in the marketplace; (4) the name "opened doors" for the company and provided "instantaneous brand awareness;" (5) they were actively seeking additional ways to "capitalize" on consumer confusion with Activision's brand; and (6) they have experienced consumer confusion, including misdirected phone calls, from their use of the ACTIVISION name.  Defendants also admitted that in addition to the benefit already received from their use of Activision's name, they thought they could make money by ███████████████████████████████

Defendants' adoption of Activision's brand name is nothing short of a trademark land grab, designed to appropriate for themselves Activision's exceptional reputation, so they could use it for on-demand digital media technologies that were part of, or inherently related to, Activision's own products and services.  In furtherance of their scheme, Defendants registered a trademark in "Activision" for an extremely narrow set of products (digital advertising signage) and then (believing that their registration gave them carte blanche to use the name), expanded their business into areas that are directly and immediately related to

1

Mitchell
Silberberg &
Knupp LLP

5350007.1

Activision's core business: namely, interactive entertainment, video games, and computers.  Defendants deliberately blurred the distinction between their products and Activision's, including by using the name "Activision" (not Activision TV, a mark they subsequently attempted to register) in their marketing materials, describing their services as an "entertainment hub," and falsely claiming that they held a registered "Activision" trademark for interactive computer products and had been producing on-demand entertainment products for more than a decade. Notably, Defendants consistently touted the availability of video games – including Activision's games – on their system.

As discussed below, the undisputed facts confirm – both by Defendants' own admissions and through analysis under the Ninth Circuit test set forth in <u>AMF Inc. v. Sleekcraft Boats</u>, 599 F.2d 341, 348-49 (9th Cir. 1979) – that there exists, as a matter of law, a substantial likelihood of consumer confusion.  Partial summary judgment should be entered for Activision.

# I.    STATEMENT OF UNDISPUTED FACTS.

## A.    <u>Plaintiff Activision Publishing, Inc.</u>

**Activision and its Business.**  Activision, founded in 1979, is one of the world's leading developers and publishers of interactive entertainment products, including video and computer games and related products.  Plaintiff's Statement of Undisputed Facts ("SUF") ¶ 1. Activision is among the largest video game publishers in the world.  SUF 2.

**Activision's Products.**  In the 35 years since it was founded, Activision has developed and distributed hundreds of video games for nearly every video game platform.  Its video game "console" products are played using a piece of computer hardware (*e.g.,* Atari, Xbox, PlayStation) attached to a television set.  Activision also has published video games and other software products for every major personal computer system and platform since the 1980s; has released many games for handheld and mobile platforms; and offers a variety of Internet browser-based

games.  Activision's catalog of hundreds of video game titles includes some of the best-known and most popular video games ever created, from classic 1980s cartridge games; to popular 1990s PC games and software; to current blockbuster console franchises.  Activision's products span every genre, are designed for a broad range of age groups, and include many games based on popular motion picture, television, or animated properties.  Activision has sold millions of copies of its video games.[1]  SUF 3-8.

Activision licenses its video game properties and its Activision name and logo for a variety of products and peripherals, including video game consoles (*e.g.,* Xbox consoles and a "plug-and-play" "Activision TV" video game system); computer hardware, such as headsets and mice; toys; clothing; books; and an array of other consumer products, such as flashlights and keychains.  Activision games have been licensed for video arcade kiosks and are available in hotel game rooms and mobile entertainment trucks.  Activision also has licensed its games for inclusion on at least one hotel and airline game system.  SUF 11-14.

**The Activision Trademark.**  For more than 30 years, Activision's hundreds of products have prominently featured the ACTIVISION word mark and/or the ACTIVISION logo.  In the ACTIVISION logo, the letters T and V are larger than the other letters.  The ACTIVISION name and logo typically appear on the front and back covers of every game box, and on the product media itself (*i.e.* the game CD or cartridge).  Many Activision product packages feature images of a television set.  For most Activision games, the ACTIVISION name and/or logo appear prominently in an opening screen when the game is launched.  SUF 15-17.

Activision owns five U.S. registrations in the U.S. Patent and Trademark Office ("PTO").  Among the goods and services included within these registrations

---

[1]  For approximately 20 years, Activision games have included a multiplayer or online component that allows players to interact and compete with each other over the Internet.  Activision also offers downloadable content and premium online services such as *Call of Duty: Elite*, which allows players to engage in online social networking activities.  SUF 9-10.

1    are video game cartridges, computer programs and instruction manuals,

2    entertainment software production services, downloadable computer game and

3    entertainment software, game strategy guides, digital audio files for use with

4    mobile and cellular phones and other wireless devices, and clothing.  SUF 18.

5    **Activision's Marketing and Promotion Of Its Products.**  Activision

6    spends millions of dollars each year to advertise and promote its products and

7    brand.  Activision advertises on television and on the Internet, including by

8    creating and releasing promotional game trailers and by maintaining a portfolio of

9    high-quality interactive websites.  Activision also engages in sponsorship

10    activities, including sponsorship of sporting events and music concerts.  Activision

11    presents at and attends dozens of conferences and trade shows each year, including

12    both game-oriented shows and conferences dedicated to consumer technology,

13    finance, and media. SUF 19-23.

14    **Activision's Distribution of its Products.**  Activision distributes its

15    products in several ways.  It distributes physical media (*e.g.,* CDs, Blu-ray discs)

16    via brick-and-mortar retail stores.  It increasingly distributes its games and related

17    content packs or add-ons through digital online services, such Microsoft's Xbox

18    Live or Valve's Steam store.  It makes its mobile games and applications available

19    in the Amazon, Apple, and Google "App stores."  Because video game and media

20    technology is rapidly evolving, Activision is constantly evaluating and

21    implementing new methods of distribution and engagement for its consumers, such

22    as using "cloud-based" technology to offer streaming game content to a wide-range

23    of consumer devices, making games available on Internet-enabled television sets,

24    pairing console games with mobile games, working with content partners to

25    integrate games with television programming, and making its games available to

26    consumers anywhere and everywhere (*i.e.*, while at home, traveling, or

27    commuting).  SUF 24-27.

28

### B.   Defendants And Their Business.

**The Original Business.**  Defendants are two corporations and their founder, President and CEO, David Gothard.  SUF 28.  Around 1999, Gothard contemplated using the name "Activision" in connection with an advertising display device (a television on a stand) he was developing, but had never actually brought to market.  SUF 29.  Gothard's attorney advised him that ACTIVISION was trademarked by Plaintiff and thus not available for his use.  Id.  Gothard later came to believe that Activision had neglected to "pick up" a third party's abandoned registration of the name "Activision," and he decided to take advantage of that situation.  SUF 30.  In 1999, Gothard and his company, Defendant Ad Media Displays, Inc. ("AMD"), applied to register, on an "intent to use" basis, a U.S. trademark for the word ACTIVISION for one very narrow category of goods: "illuminated advertising and display signs" and one very narrow category of services: "promoting the goods and services of others by creating and displaying display signs . . . and by advertising…such goods and services…over global computer networks."  The description of goods and services nowhere mentions on-demand entertainment or interactive television.  SUF 31.

In 2004, after receiving a notice of abandonment from the trademark office for failure to prove that they had used the mark in commerce, Gothard and AMD submitted a "statement of use," to which they appended a brochure for a vague and unidentified product that was not a television set, but apparently was contemplated to be used as a "digital display or sign" for advertising purposes.  SUF 32.  In 2010, Defendants submitted a "statement of incontestability," using as specimens images of a television screen on a display stand, and a kiosk with a built-in television.  SUF 33.  None of the specimens or categories of goods had anything to do with on-demand entertainment (in hotels or elsewhere) or interactive media.  Id.

**The ActivisionTV System.**  In 2006, Gothard incorporated a ***new*** company called Activision TV, Inc. ("ATV"), caused AMD to assign the 2005 registration to

Mitchell
Silberberg &
Knupp LLP

5350007.1

ATV, and shuttered AMD.  SUF 34.  Despite the very narrow scope of the 2005 registration, Defendants then began using the Activision name to promote a broad variety of computer-based products that were still in the development stage, including a "Computer Integrated Television" designed for on-demand digital media delivery.  SUF 35.  Defendants referred to this media system variously as the "Activision System," "Activision™ System," "Activision Solution," or just "Activision."  SUF 36.  As described by Defendants, the "Activision System" would pair a television monitor with an Internet-connected computer system, and thereby deliver "on demand" movies and television shows, computer applications, video games, advertisements, and other content to members of the public.  SUF 37.  ATV brochures and press releases described the system as a "totally integrated, multimedia computer television" capable of providing "word processing, data transfer, internet access, e-mail, *video games*, DVD, and more…," and marketed the product variously as an "entertainment hub," "the convergence of the computer, Internet and television," and as "Interactive TV."  SUF 38-39 (emphasis added).  In or about late 2009, Defendants filed applications to register "ACTIVISION.TV" as a trademark for "integrated computerized televisions and displays capable of operating as a television, a display and a computer" (Serial No. 85/143756); "display sets," "point of purchase displays in the nature of a kiosk" (Serial No. 77/912, 745); "electronic transmission of voice, data and images by television and video broadcasting or narrowcasting" (No. 77/827, 404); and "home theater equipment, products and components" (No. 77/978,580).  SUF 40.

Defendants have identified, and sought to exploit, a variety of potential markets for the Activision System and Computer Integrated Television ("Activision System").  They tout hotel-room entertainment as one of the first uses of the Activision System.  SUF 41.  The hotel version of the Activision System enables guests to purchase and watch movies, play video games, or access the Internet from their hotel room.  Id.

1   **Defendants' Use of The ACTIVISION name.**  Defendants take the

2   position that their 2005 "signage" trademark registration entitles them to use the

3   name ACTIVISION for any goods and services, irrespective of Activision's prior

4   rights.  "I've used the name Activision, Activision Systems, Activision Displays,

5   Activision TV.  *I own the name Activision.  And I can put any ending on it I*

6   *want*."  SUF 42 (emphasis added).  Gothard also testified that he has used, and is

7   entitled to use, the ACTIVISION mark for any products pertaining to "technology,

8   computers, screens, cloud computing," as well as on-demand movies, games,

9   broadcasting, or anything that could be transmitted via the system.  SUF 43.

10   Defendants' business strategy has been to use the term *Activision* (not

11   "Activision TV") ███████████████████████████ (emphasis added).

12   SUF 44.  These materials contain taglines such as "With ACTIVISION you get

13   TOTAL SYSTEM INTEGRATION," "Activision [has been] been bringing new

14   ideas to [television and computer] technologies for over 14 years," and

15   "Activision's new technology goes beyond the ordinary."  SUF 45.  Defendants

16   have made presentations to businesses and investors around the country using the

17   name "Activision," often (falsely) representing that they possess a registered

18   trademark for ACTIVISION for interactive television services.  SUF 46, 50.

19   Defendants have attended and presented at a variety of technology-related trade

20   shows around the country (including the Consumer Electronics Show), at which

21   they distributed brochures with the Activision name and displayed a large

22   "Activision.TV" banner.  SUF 47.  Defendants have used the Activision name in

23   their attempts to develop and finance their business and to license content for use

24   in their products.  SUF 48-49.  Defendants also market their products and services

25   on a website located at www.activision.tv.  On many pages (including the home

26   page), the website prominently displays the word ACTIVISION®, sometimes

27   followed by a smaller icon of a television screen with the words ".TV" inside.  The

28   website contains a demonstration of the Activision System, with the title: "The

Mitchell
Silberberg &
Knupp LLP

5350007.1

7

1    Activision difference!"  SUF 51.

2        Defendants claim that the Activision System is being installed in at least two

3    hotels, although they have yet to be able to install a system that actually works.

4    SUF 52.  Nonetheless, demonstrations and marketing materials distributed by

5    Defendants and their partners reflect that, once the system is up and running, the

6    word ACTIVISION will appear on the set-top box in each hotel room, and on the

7    television screen when content is shown.  SUF 53.

8        **ATV's Plans To Expand Into Other Markets.**  ATV trumpets that the

9    hotel business is just the beginning of its overall business plan.  It says that it is

10   going to partner with technology and media services (including DirecTV and/or

11   EchoStar/Dish) to offer its interactive television products to the consuming public

12   as a replacement for a cable TV or satellite box.  ATV intends to enter the home

13   entertainment market and compete with systems such as Microsoft's Xbox, to

14   provide an all-in-one home entertainment and media hub.  ATV also intends to

15   offer its products for use in grocery stores, movie theaters, hospitals, schools,

16   sports bars, convenience stores, shopping malls, and airplanes.  SUF 54-56.

17       **The Activision System and Video Games.**  A key feature of the Activision

18   System touted by Defendants is video games on demand: "We can do everything

19   the Xbox does."  SUF 57-58.  In fact, Defendants admit that their system could

20   replace a hotel game room.  SUF 59.  Defendants anticipate offering big-budget

21   titles on their system, including Activision's games.  SUF 60.  ("What better way

22   than, when they put a game app on there, up comes Activision games.")

23   Defendants have consistently marketed and promoted the availability of video

24   games on their Activision System:

25       ●    The availability of video games on Defendants' system is advertised

26   throughout their website, including on its homepage.  A video "demo" on the

27   website shows the hugely popular game World of Warcraft® (published by

28   Activision's affiliate) available and pre-loaded onto the system.  SUF 61.

1   • Brochures, pamphlets, and press releases promoting the Activision

2   System tout video games as one of the system's primary features. ("Games and

3   more…") ("Only ACTIVISION's all in one [system] offers … video games

4   available.") ("Activision TV's solutions provide view[sic] access to… ***video***

5   ***games***, DVD and more.") SUF 62 (emphasis added).

6   • Demonstrations and mock-ups provided to potential clients or at trade

7   shows reflect the availability of games on the system.  SUF 63.

8   • Proposals prepared by Defendants for prospective hotel usage have

9   promised that the system would provide hotel guests with video games.  Video

10  games were part of the "basic package" Defendants offered to hotels.  SUF 64.

11  • Defendants' revenue models projected that hotels would charge

12  $10/day for video games, and in presentations Defendants cited games as one of

13  the ways in which ███████████████████  SUF 65.

14  • Defendants either have or contemplate embedding within the

15  Activision TV website "metatags" for the word "gaming," so that search results for

16  "Activision" and "Gaming" would generate links to ATV's website.  SUF 66.

17  **Defendants' Intent to Capitalize on Plaintiff's ACTIVISION name and**

18  **trademark.**  No fewer than ***three*** of ATV's business plans state:



23  SUF 67 (bold in original, bold italics emphasis added).  Defendants specifically

24  told their PR firm that they wanted to "capitalize on the brand/name," and that

25  "***Activision opens doors***."  SUF 68 (emphasis added).  Notes from one PR meeting

26  quote Defendant Gothard as follows:  "This issue [the Activision name], ***investors***

27  ***confused***.  Activision bought out by Blizzard (largest gaming company in the

28  world). ***HOW DO WE CAPITALIZE ON THIS?***"  SUF 69 (emphasis added,

1  capitals in original).  ███████████████████████

2  ████████████████████████████████████████  SUF 73.

3  ### C.    Procedural History

4      In 2009, Defendants tried to register trademarks for "ACTIVISION.TV" for

5  dozens of computer-related goods and services, including computers, television

6  sets, digital display screens, computer servers and components, and digital

7  broadcasting services.  Upon learning of these trademark filings, Activision

8  conducted a brief investigation, and sent Defendants a letter demanding that they

9  stop using the ACTIVISION name.  ATV refused to do so.  The PTO initially

10  rejected all but one of Defendants' trademark applications as being likely to cause

11  confusion with Activision's ACTIVISION marks.  After Defendants narrowed the

12  scope of their applications, they were allowed for publication.  Activision filed

13  Notices of Opposition to Defendants' trademark Applications.  After completing

14  discovery in the TTAB proceedings (during which Activision learned of

15  Defendants' ongoing conduct and business plans) Activision filed this lawsuit.

16  SUF 74-79.

17  ## II.    THE LEGAL STANDARD.

18      Where, as here, "the evidence is clear and tilts heavily in favor of a

19  likelihood of confusion," summary judgment for trademark infringement is proper,

20  and the Ninth Circuit has "not hesitated to affirm."  Au-Tomotive Gold, Inc. v.

21  Volkswagen of Am., Inc., 457 F.3d 1062, 1075 (9th Cir. 2006); see also Nissan

22  Motor Co. v. Nissan Computer Corp., 378 F.3d 1002, 1019 (9th Cir. 2004)

23  (affirming summary judgment on the basis of likelihood of initial interest

24  confusion); U. S. Jaycees v. San Francisco Jr. Chamber of Commerce, 354 F.

25  Supp. 61, 78 (N.D. Cal. 1972) aff'd, 513 F.2d 1226 (9th Cir. 1975) ("[W]here there

26  is no genuine issue as to any material fact concerning the existence of a likelihood

27  of confusion, this Court has clear authority to grant summary judgment.")

28

Mitchell
Silberberg &
Knupp LLP

5350007.1

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

### III.  ACTIVISION IS ENTITLED TO SUMMARY JUDGMENT ON ITS FIRST, SECOND, AND FOURTH CLAIMS FOR RELIEF.

Activision is entitled to summary judgment on its claims for Trademark Infringement, False Designation of Origin, and Unfair Competition.  Liability for each of these claims requires a showing that (1) the ACTIVISION mark is valid and protectable; and (2) Defendants used a similar mark in a way likely to cause customer confusion, deception, or mistake.[2]  Brookfield Communications, Inc. v. W. Coast Entm't Corp., 174 F.3d 1036, 1046 (9th Cir. 1999) (liability is established if defendant uses a mark "confusingly similar to a valid, protectable mark of [plaintiff's]"); Acad. of Motion Picture Arts & Sciences v. Creative House Promotions, Inc., 944 F.2d 1446, 1457 (9th Cir. 1991).  Both elements are met here.  In fact, the undisputed evidence demonstrates that Defendants have tried to "manufacture precisely such confusion and thereby siphon off the goodwill of [Activision's] popular mark."  Dreamwerks Prod. Grp., Inc. v. SKG Studio, 142 F.3d 1127, 1129 (9th Cir. 1998).

### A.  Activision Has Used the ACTIVISION Mark For Over 30 Years.

Activision has owned, used, and popularized its distinctive ACTIVISION mark in commerce for more than 30 years.  SUF 1-27.  In trademark law, "[t]he first to use a mark is deemed the 'senior' user and has the right to enjoin 'junior' users from using confusingly similar marks in the same industry and market or within the senior user's natural zone of expansion."  Brookfield, 174 F.3d at 1047. In addition to its common law rights in the mark, Activision holds several federal incontestable registrations for ACTIVISION, further evidence of Activision's ownership of and use of the mark since the 1980s.  15 U.S.C. § 1115; Sengoku Works Ltd. v. RMC Int'l, Ltd., 96 F.3d 1217, 1219 (9th Cir. 1996).  As Ad Media

---

[2]  Courts apply the same test to infringement of corporate "trade names" as they apply to the use of trademarks applied to goods and services.  New West Corp. v. NYM Co., 595 F.2d 1194, 1201 (9th Cir. 1971) ("[t]rade name infringement ... is based on considerations similar to trade-mark infringement," and both "preclude one from using another's distinctive mark or name if it will cause a likelihood of confusion or deception as to the origin of the goods.").

Mitchell
Silberberg &
Knupp LLP

5350007.1

11

Displays and ATV did not begin to market products until 2002 at the very earliest,
SUF 100, Activision has priority of use and ownership of the mark ACTIVISION.
Id.  Newcomers such as Defendants have the duty to avoid selecting a mark close
to an established mark in order to protect the senior user's goodwill.  See
Dreamwerks, 142 F.3d at 1132 (A new company "must ensure that its proposed
mark will not infringe on the rights of existing trademark holders").

> **B.** **Defendants' Use of the ACTIVISION Mark Causes And Is Likely To Cause Confusion.**

Likelihood of confusion is "not limited only to confusion as to the source or
origin of the goods.  Rather, the appropriate inquiry is whether the average
purchaser would be likely to believe that the infringer's product has 'some
connection' with the trademark owner."  Grey v. Campbell Soup Co., 650 F. Supp.
1166, 1173 (C.D. Cal. 1986) aff'd, 830 F.2d 197 (9th Cir. 1987).  There is a
likelihood of confusion if customers believe the plaintiff "***sponsored***, ***approved, or***
***licensed*** the defendant's activities."  Ferrari S.p.A. Esercizio Fabbriche
Automobilie Corse v. McBurnie, 11 U.S.P.Q.2d 1843, 1847, 1989 WL 298658
(S.D. Cal. June 1, 1989) (emphasis added).  Defendants' use (and contemplated
use) of the marks "Activision TV," "Activision Systems" and "Activision" in
connection with their products creates a likelihood of confusion among several
different groups of consumers in at least three discrete ways:

*First*, Defendants' use is likely to confuse consumers who pay to use
Defendants' services (*e.g.* hotel guests who purchase movies or videogames on
Defendants' entertainment system).  These consumers will be exposed to
Defendants' Activision mark when they activate their hotel room television and
make a purchase decision, or when they research hotels and encounter websites or
press releases promoting the "Activision System."  Such consumers are likely to
believe that Activision is associated with Defendants' products and services and/or
is the source of the technology being offered by Defendants or their partners.

Mitchell
Silberberg &
Knupp LLP

5350007.1

12

***Second***, Defendants' use of the ACTIVISION name is likely to cause "initial interest confusion" among the investors, hotels, and media companies that Defendants have approached and will continue to approach in their attempts to finance or place their products. Initial interest confusion exists when defendants draw attention to their product by "misappropriating [plaintiff's] acquired good will." Brookfield, 174 F.3d at 1063-64 (collecting cases). "[E]ven though no actual sale is finally completed as a result of the confusion," this initial interest confusion "may be still an infringement." Id.; Mobil Oil Corp. v. Pegasus Petroleum Corp., 818 F.2d 254, 257-59 (2d Cir. 1987); see also Nissan Motor Co. v. Nissan Computer Corp., 378 F.3d 1002, 1018 (9th Cir. 2004); Elvis Presley Enters., Inc. v. Capece, 141 F.3d 188, 204 (5th Cir. 1998) (defendant created initial interest confusion by using "Elvis" to draw patrons into a bar, though they would realize before purchasing a drink that the bar has "no relationship with [the King]": "[o]nce in the door, the confusion has succeeded."). Defendants admitted their intent to cause initial interest confusion (and success in doing so) when they noted that the Activision name "opens doors" for them.

***Third***, Defendants' use is likely to cause "post-sale" confusion. Post-sale confusion occurs when "consumers view a product outside the context in which it is originally distributed and confuse it with another, similar product." Acad. Of Motion Picture, 944 F.2d at 1455. In this way, confusion may arise among members of the public who encounter Defendant's products in hotels or other establishments that have purchased or leased them. Such confusion can damage a company's reputation or goodwill, and "the fact that the injury is to a company's reputation or goodwill, rather than directly to its sales, does not render the confusion any less actionable." Beacon Mut. Ins. Co. v. OneBeacon Ins. Group, 376 F.3d 8, 15 (1st Cir. 2004). For example, in In re Artic Electronics Co., Ltd., 220 U.S.P.Q. 836, 838, 1983 WL 51896 (T.T.A.B. 1983), the TTAB held that "MARS" for coin-operated video games was likely to cause confusion with

"MARS" for coin changing machines: Though arcade patrons were not purchasers of either product, "arcade customers frustrated or annoyed by malfunctioning bill and coin changers might well generalize their impressions as to defective workmanship to registrant's video game machines if misled by the identity of trademarks to assume a common source association."

Each of these types of confusion is separately actionable, and a showing that ***any of them*** is likely to occur warrants summary judgment in Activision's favor.

## C. Each Of The *Sleekcraft* Factors Weighs Heavily In Favor Of A Likelihood of Confusion.

The Ninth Circuit evaluates likelihood of confusion using the multi-factor test articulated in <u>AMF Inc. v. Sleekcraft Boats</u>, 599 F.2d 341, 348-49 (9th Cir. 1979).[3] The <u>Sleekcraft</u> test is simply "intended to guide the court in assessing the basic question of likelihood of confusion" and thus "the presence or absence of a particular factor does not necessarily drive the determination of a likelihood of confusion." <u>E. & J. Gallo Winery v. Gallo Cattle Co.</u>, 967 F.2d 1280, 1290-91 (9th Cir. 1992). "In a close case amounting to a tie, ***doubts are resolved in favor of the senior user***." <u>Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.</u>, 109 F.3d 1394, 1404 n.14 (9th Cir. 1997) (emphasis added). Defendants have ***admitted*** both actual and likely confusion arising from their use of the ACTIVISION mark. Their own documents reflect that they were aware of "noise and possible confusion," that their investors were "confused," and that their use of the "wildly [sic] known" Activision name would give them "instantaneous brand awareness" and "open doors." SUF 70. This alone should end the inquiry. Moreover, each of the <u>Sleekcraft</u> factors weighs overwhelmingly in Activision's favor.

---

[3] The <u>Sleekcraft</u> factors are: (1) strength of the mark; (2) proximity or relatedness of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of product lines. <u>Sleekcraft</u>, 599 F.2d at 348-49.

Mitchell Silberberg & Knupp LLP

5350007.1

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

### 1.    Defendants' Admitted Intent To Trade On Activision's Goodwill Is Highly Probative Of Consumer Confusion.

"In the Ninth Circuit, a defendant's knowing adoption of a mark similar to the plaintiff's raises a ***presumption of confusion***." Sega Enters. Ltd. v. MAPHIA, 948 F. Supp. 923, 937 (N.D. Cal. 1996) (emphasis added); see also Official Airline Guides, Inc. v. Goss, 6 F.3d 1385, 1394 (9th Cir. 1993) ("When an alleged infringer knowingly adopts a mark similar to another's, courts will presume an intent to deceive the public."); Playboy Enters., Inc. v. Netscape Communications Corp., 354 F.3d 1020, 1029 (9th Cir. 2004) ("A defendant's intent to confuse constitutes probative evidence of likely confusion"); Interstellar Starship Services, Ltd. v. Epix Inc., 184 F.3d 1107 (9th Cir. 1999) ("[I]ntent to deceive is strong evidence of a likelihood of confusion.").  This presumption arises because "[w]hen the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose: that is, that the public will be deceived." Sleekcraft, 599 F.2d at 354.  "[A] defendant who purposely chooses a particular mark because it is similar to that of a senior user is saying, in effect, that he thinks that there is at least a possibility that he can divert some business from the senior user – and the defendant ought to know at least as much about the likelihood of confusion as the trier of fact." Little Caesar Enters., Inc. v. Pizza Caesar, Inc., 834 F.2d 568, 572 (6th Cir. 1987).

Defendants' own statements – including that the ACTIVISION name has ███████████████████████ and █████████████████████████ "***opened doors***" for the company; and should be "***capitalize[d]***" on – confirm Defendants' intent to deceive and to trade on Activision's brand (emphasis added).  This plainly was their intent from the outset.  Defendants admittedly knew of Activision and its well-known trademark before they began using "Activision" and "Activision TV" on their products.  When they decided to enter the interactive and on-demand entertainment business, they not only continued to use the ACTIVISION name, but

15

Mitchell
Silberberg &
Knupp LLP

5350007.1

also changed their corporate name.[4]  SUF 29-30, 34-36.  Then, knowing that there was "noise and possible confusion" associated with their use, Defendants engaged in conduct designed to foster confusion, such as referring to themselves as "Activision" (without the TV suffix), and falsely representing that they possessed a registered trademark for ACTIVISION in connection with computer and interactive media products.  SUF 46, 49, 70.  Moreover, Defendants' incessantly touted video games as part of their services and falsely represented to the public that they were licensed to offer Activision games such as World of Warcraft.  SUF 41, 57, 61-62.

## 2. Plaintiff's ACTIVISION Mark Has Great Conceptual and Marketplace Strength.

A trademark's strength is "evaluated in terms of its conceptual strength and commercial strength."  GoTo.com, Inc. v. Walt Disney Co., 202 F.3d 1199, 1207 (9th Cir. 2000).  "The more likely a mark is to be remembered and associated in the public mind with the mark's owner, the greater protection the mark is accorded."  Id.  Here, the ACTIVISION mark for video games and related products is exceptionally strong.  As Defendants' CTO acknowledged: "I think most people know about Activision Gaming Company or Activision Games."  SUF 80-81.

For conceptual strength,[5] fanciful, arbitrary and suggestive marks are "inherently more distinctive and, hence, are … stronger marks."  SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd., 846 F. Supp. 2d 1063, 1078 (N.D. Cal. 2012).

---

[4] Defendants' professed belief that the Activision name was "available" does not negate their intent to confuse.  See Mortgage Elec. Registration Sys., Inc. v. Brosnan, No. C 09-3600 SBA, 2009 WL 3647125 at *7 (N.D. Cal. Sept. 4, 2009) ("Defendants…claim that they used Plaintiff MERS' name because it was 'available' in California, Arizona, Washington, Oregon and Texas.  However, Defendants never explain why it was necessary for them to form their entities using a name identical to Plaintiff MERS, particularly given their awareness of Plaintiff MERS' standing in the real estate mortgage industry.").

[5] "Conceptual strength is judged on a sliding scale from (1) inherently distinctive marks (arbitrary and fanciful), meriting strong protection, to (2) suggestive marks, meriting less protection, to (3) descriptive marks, meriting protection only when secondary meaning has been established, to (4) generic marks which do not merit protection."  Quigley v. Guvera IP Pty Ltd., No. C 10-03569 CRB, 2010 WL 5300867 at *8 (N.D. Cal. Dec. 20, 2010).

Mitchell Silberberg & Knupp LLP

5350007.1

16

ACTIVISION is either "arbitrary" or "suggestive" of Activision's products, as the underlying words do not clearly indicate interactive entertainment products, and at least require an imaginative leap to suggest Plaintiff's products.  See Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery, 150 F.3d 1042, 1047 n.8 (9th Cir. 1998) (A mark that "does not describe the product's features, but suggests them ... is [] classified as 'suggestive'"); Conversive, Inc. v. Conversagent, Inc., 433 F. Supp. 2d 1079, 1090-91 (C.D. Cal. 2006) (CONVERSIVE and CONVERSIVE AGENT were suggestive marks for computer software for natural language applications, so strength factor favored finding likely confusion).

The ACTIVISION mark also has great commercial strength.  SUF 80. Commercial strength is measured by how many times the mark has been displayed, how much the trademark owner has spent on advertising and promotion, and the resulting public recognition of the mark.  See GoTo.com, 202 F.3d at 1208 (plaintiff's trademark had been displayed "many billions of times" on the Internet and was thus a strong mark); E & J Gallo Winery v. Consorzio del Gallo Nero, 782 F. Supp. 457, 462 (N.D. Cal. 1991) ("Gallo" for wine was an "extraordinarily strong and distinctive mark:" it had been used for over 50 years; plaintiff had "spent some $500 million in advertising its wines under the mark"; and  "some 2 billion bottles of wine bearing the Gallo mark" had been sold); UGG Holdings, Inc. v. Severn, No. CV04-1137-JFW, 2005 WL 5887187 at *7 (C.D. Cal. Feb. 23, 2005) (UGG mark for boots "extremely strong," noting millions of dollars spent on advertising, and extensive media coverage).  Activision is among the world's largest video game companies.  It has existed for more than 30 years.  Its products have broken sales records and received numerous awards.  Activision devotes many millions of dollars *each year* to advertising.  Its activities receive wide media attention, and a Google search for the word "ACTIVISION" generates tens of millions of results.  Activision has innovated and revolutionized the industry with franchises such Guitar Hero and Skylanders.  Displayed on game boxes, "splash

Mitchell
Silberberg &
Knupp LLP

5350007.1

17

screens," advertisements, and on its website, the ACTIVISION mark has been shown countless times, "providing compelling evidence of [its] strength." GoTo.com, 202 F.3d at 1208. *See, e.g.,* SUF 1-8, 15, 19-22.

### 3. The Marks Are Identical In Sight, Sound, and Meaning.

"The greater the similarity between the two marks, the greater the likelihood of confusion." Electropix v. Liberty Livewire Corp., 178 F. Supp. 2d 1125, 1131 (C.D. Cal. 2001). Similarity is evaluated based on the "appearance, sound and meaning of the marks when considered in their entirety and as they appear in the marketplace." Id. Similarities between the marks are "weighed more heavily than the differences, id., and similarity in any one of these elements may be sufficient to find a likelihood of confusion. In re White Swan Ltd., 8 U.S.P.Q.2d 1534, 1535, 1988 WL 252416 (T.T.A.B. 1988). There is "perfect similarity of sound," between Plaintiff's ACTIVISION Mark and Defendant's use of "Activision," "Activision Systems," "Activision Solution" and "Activision TV." Dreamwerks, 142 F.3d at 1131. Defendants' own marketing firm noted that "[t]he two names are exactly the same. Anybody reading Activision TV and Activision Publishing would assume that one is a division of the other." SUF 82. The meaning also is similar because "neither literally means anything," and both suggest interactive media or television. Cf. id. ("Dreamworks" did not "literally mean[] anything" but rather at best suggested a "fantasy world"). That the parties' logos are slightly different is of no moment, since Defendants regularly refer to themselves (and their system) in press releases, presentations, advertisements, and business plans as "Activision," without the logo.

Defendant's occasional inclusion of the suffix "TV" or ".tv" does not change the analysis. "TV" is simply descriptive of the products Defendants offer. It also is a term that is routinely used by computer software and hardware companies to refer to their TV or media-related services or set-top boxes. "Apple TV," "Google TV," "Nintendo TVii," and "Microsoft TV" are just a few examples. SUF 84. In

fact, Activision's competitor Take-Two Interactive (owner of Rockstar Games and maker of the game "Grand Theft Auto") has applied for trademark registrations for "ROCKSTAR TV" and "GTA TV." SUF 85. The suffix "*.tv*" ("dot-tv") is a reference to a generic "top-level" domain name, like .com, .org, and .net. It cannot be considered part of Defendants' trademark and does not alleviate confusion. <u>See</u> <u>Brookfield</u>, 174 F.3d at 1055 ("moviebuff.com" infringed "moviebuff"). If anything, the .tv suffix ***adds*** to the confusion by suggesting that "Activision.tv" is a domain name held by Activision. Many other companies, such as Apple, Microsoft, Nintendo, and Google have registered and own their company names in the .tv domain space. SUF 86. In any event, Activision is *the* dominant lead portion of both marks, and that is sufficient. <u>See</u> <u>Gallo Nero</u>, 782 F. Supp. at 463-64 ("Gallo" was the distinctive term in "GALLO" and "GALLO NERO").

### 4. The Parties' Goods Are Closely and Logically Related.

"'[P]roducts which would be reasonably thought by the buying public to come from the same source if sold under the same mark' are considered related." <u>Electropix</u>, 178 F. Supp. 2d at 1131. The parties' goods and services need not be identical or even directly competitive to find a likelihood of confusion. <u>Safety-Kleen Corp. v. Dresser Indus., Inc.</u>, 518 F.2d 1399, 1404 (C.C.P.A. 1975). The focus of this factor is whether Plaintiff's customers are likely to associate Defendant's goods with Plaintiff. <u>Dreamwerks</u>, 142 F.3d at 1131. If the goods are "complementary," i.e. if they may be used together, this will also favor a finding of relatedness. <u>SunEarth</u>, 846 F. Supp. 2d at 1077 (factor weighed in plaintiffs' favor where "at least one of their products . . . may be used directly in conjunction with Defendants' products, as a mounting system for the latter").

It is well-established that computer software products (such as video games) are "related" to computer hardware products, so that the use of the same name for both types of products is likely to result in consumer confusion. <u>See</u> <u>Octocom Sys., Inc. v. Houston Computer Servs., Inc.</u>, 918 F.2d 937 (Fed. Cir. 1990)

Mitchell
Silberberg &
Knupp LLP

5350007.1

1    (computer modems and software programs are highly related because the products

2    are used in conjunction with each other).  In fact, it "may well be approaching the

3    status of a matter of common knowledge" that the makers of computer software are

4    routinely engaged in the production and distribution of hardware products, such as

5    computers, consoles, set-top or cable boxes, and hardware peripherals.  In re

6    Graphics Technology Corp., 222 U.S.P.Q. 179, 181, 1984 WL 63029  (T.T.A.B.

7    1984).  Thus, "many courts have found that the use of a very similar trademark

8    used on computer software will infringe a trademark used on computer hardware,

9    and vice-versa."  4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair

10   Competition §24:44 at 24-109 (4th ed. 2013) [hereinafter "McCarthy"] (collecting

11   cases); see, e.g., Lambda Electronics Corp. v. Lambda Technology, Inc., 515 F.

12   Supp. 915 (S.D.N.Y. 1981) (LAMBDA for customized software infringes

13   LAMBDA for power supplies and semiconductors); In re Emulex Corp., 6

14   U.S.P.Q.2d 1312, 1987 WL 124024 (T.T.A.B. 1987) (JAVELIN for computer

15   peripheral storage unit likely to be confused with JAVELIN for 'prerecorded

16   computer programs'"); In re TIE/Communications, Inc., 5 U.S.P.Q.2d 1457, 1987

17   WL 123872 (T.T.A.B. 1987) (DATA STAR for computer programs and

18   "voice/data communications terminals").

19        This line of cases is directly applicable here, because the relationship

20   between and among video games, set-top boxes or consoles, and on-demand

21   entertainment is long-standing and immediately obvious.  ATV's own marketing

22   plan even identified Activision as a "*related technolog[y]*."  SUF 88 (emphasis

23   added).  All three current video game console makers – Sony, Nintendo, and

24   Microsoft – create video games. SUF 83.  Like Defendants' system, these video

25   game consoles feature the ability to stream movies, television shows, and music; to

26   connect to the Internet; and to allow users to engage in social networking.  Id.

27   Each of these companies has publicly stated that its console is intended to create an

28   all-in-one living room, home entertainment experience, and each offers video

1  games for download on-demand.  Id.  Recently, the video game developer Valve

2  announced its plan to offer hardware capable of downloading and playing

3  computer games.  SUF 87.  Other software companies and content providers

4  likewise have distributed hardware products or licensed their name for hardware

5  products (e.g, Google's Android phones, Amazon's Kindle tablets).  Activision has

6  licensed its games for a variety of computer hardware products, such as game

7  consoles, headsets, controllers, digital cameras, arcade kiosks, and even an

8  "Activision TV" game system.  Activision also has entered into a cross-branding

9  and license agreement with Smart TV maker LG.  SUF 11-14.  Thus, the

10  relatedness between video games and entertainment systems is unassailable.

11      The specific relationship between Activision's video games and Defendants'

12  hotel systems is as clear as the general relationship between video games and

13  entertainment systems.  Leading providers of hotel in-room systems (including

14  Defendants' chief competitor LodgeNet) offer on-demand video games.  Many

15  hotels offer in-room game consoles, on-demand games, video game rooms, and

16  entertainment centers, including specific promotion of Activision games.  Hotels

17  increasingly are providing a variety of in-room entertainment content delivery

18  options, such as tablet computers and Apple TV systems.  Further, game console

19  manufacturers such as Nintendo have entered the hotel room business.  In fact,

20  Activision licensed one of its games for the "Nintendo Gateway System," which

21  was designed to bring games to hotel guests and airline passengers.  Not

22  surprisingly, therefore, Defendants have promoted the gaming capabilities of their

23  products both to hotels and to the end-users (hotel guests).  SUF 51, 57, 89-94.

### 5.   Defendants Intend To Expand Into Plaintiff's Market.

25  "[A] 'strong possibility' that either party may expand his business to

26  compete with the other will weigh in favor of finding that the present use is

27  infringing."  Sleekcraft, 599 F.2d at 354.  See, e.g., SunEarth, 846 F. Supp. 2d at

28  1080-81 (intent to expand factor weighed in favor of plaintiffs who had engaged in

"some expansion" into the defendant's market by developing (even if not yet selling) a product similar to defendants).

Defendants have admitted that their products are "constantly changing," and that their contemplated changes will bring them directly into Activision's market. The system Defendants currently are marketing to hotels allows users to play Internet, browser-based games (including Activision's Skylanders browser games), and they intend to offer big-budget, "AAA" games that will either be pre-loaded onto the system, or available via a "cloud" gaming service (*i.e.*, streamed through the Internet). SUF 94. Defendants also have confirmed that they intend to expand into the home market, providing interactive entertainment systems similar to the Xbox. SUF 54-55, 95. Indeed, Defendants' 2009 trademark applications establish that they intend to target "commercial buyers" in, *inter alia*, the "commercial entertainment," "transportation," and "retail market channels;" that they intend to offer "integrated computerized televisions and displays capable of operating as a television, a display and a computer" (similar to the xBox); and to offer services of "electronic transmission of voice, data and images by television and video broadcasting or narrowcasting." SUF 40. These activities will bring Defendants either directly into conflict with Activision's core market or within the "natural zone of expansion" of Activision. (In fact, Activision is currently exploring and negotiating the inclusion of its games in certain Smart TV systems. SUF 12, 27, 96). Westchester Media v. PRL USA Holdings, Inc., 214 F. 3d 658, 666 (5th Cir. 2000) ("The danger of affiliation or sponsorship confusion increases when the junior user's market is one into which the senior user would naturally expand.")

### 6.    Actual Confusion Already Is Apparent.

"[A]ctual confusion is not necessary to a finding of *likelihood of confusion* under the Lanham Act." Acad. of Motion Picture Arts and Sci., 944 F.2d at 1456 (emphasis added). In this case, information about actual confusion is all but impossible to collect because Defendants do not have a functioning product

installed in any hotel (or other public establishment). <u>C.f.</u> <u>Brookfield</u>, 174 F.3d
1036, 1060 (9th Cir. 1999) ("Actual confusion is not relevant because Brookfield
filed suit before West Coast began actively using the "moviebuff.com" mark and
thus never had the opportunity to collect information on actual confusion."). 
However, even at this early stage of Defendants' product rollout, there is evidence
of confusion.  Defendants themselves grudgingly admit there have been "a few
instances where a customer of [Defendants] has inquired about [Activision] with
respect to gaming software."  SUF 71. Defendants also admit that "investors [are]
confused" about the Activision name, and other evidence confirms this.  SUF 69-
71.  Defendants' public relations firm also encountered "noise and possible
confusion" arising from Defendants' use of the Activision name, and believed they
"needed to disassociate the companies."  SUF 70, 72.

> **7.    The Parties Use The Same Or Similar Marketing Channels.**

"Convergent marketing channels increase the likelihood of confusion." 
<u>Official Airline Guides</u>, 6 F.3d at 1393.  Both parties market and distribute (or
purport to distribute) entertainment media through the Internet or digital
distribution channels.  SUF 9-10, 27, 99.  Both market and promote their products
at the same consumer electronics trade shows. SUF 97.  <u>See</u> <u>SunEarth</u>, 846 F.
Supp. 2d at 1079 (attending the same trade shows and conventions is evidence of
"convergent marketing channels").  Both have used event sponsorships to market
their products.  SUF 98.  Moreover, the likelihood of confusion analysis is not
limited to the parties' present marketing channels or distribution methods, but also
includes those reasonably likely to be used in the future.  <u>San Fernando Electric
Mfg. v. JFD Electric Components Corp.</u>, 565 F.2d 683, 685 (C.C.P.A. 1988)
(registrant's rights "are not to be tied into its current business practices…")

> **8.    Degree Of Care.**

As likelihood of confusion is determined on the basis of a "reasonably
prudent consumer," the expectations of care exerted by the customers "depends on

the circumstances." <u>Brookfield</u>, 174 F. 3d at 1060. "[W]hen dealing with inexpensive products, customers are likely to exercise less care, thus making confusion more likely." <u>Id.</u> Even professional buyers "are not immune from source confusion" where the marks are substantially identical and the goods are overlapping. <u>In re Total Quality Group Inc.</u>, 51 U.S.P.Q. 2d 1474, 1999 WL 588248 (T.T.A.B. 1999); <u>see also</u> <u>CAE, Inc. v. Clean Air Engineering, Inc.</u>, 267 F.3d 660 (7th Cir. 2001) ("The convergence of the parties' technologies makes it more likely that even an informed and sophisticated consumer will mistakenly attribute the parties' products and services to a common source."). Hotel guests using the Activision System or encountering it in a hotel room are likely to exercise relatively little care, as Defendants' projected price for an in-room movie or video game is not very high (under $10), and this would be a spontaneous purchase. SUF 65. If the viewing experience is disappointing, a confused customer may attribute that to Plaintiff. <u>Artic Electronics</u>, 220 U.S.P.Q. at 838. Technology companies, hoteliers, and venture capitalists with whom Defendants seek to do business by definition are approached by untold numbers of companies looking to do business, and necessarily view business cards, trade show booths, and banners. That they are "not immune from source confusion," (<u>In re Total Quality Group Inc.</u>, 1999 WL 588248 at 1477) is obvious from Defendants' admission that the "Activision" name alone was sufficient to "open doors." SUF 68, 70, 81 (agreeing that Activision TV name will have a "great marketing advantage" because "most people know about Activision Gaming Company, or Activision Games. They don't know about ActivisionTV.")

## IV.   ACTIVISION IS ENTITLED TO SUMMARY JUDGMENT ON ITS SIXTH CLAIM FOR DECLARATORY RELIEF.

The Lanham Act grants courts the power, "[i]n any action involving a registered mark [to] determine the right to registration, order the cancelation of registrations . . . and otherwise rectify the register with respect to the registrations

1  of any party to the action."  15 U.S.C. § 1119.  Registration properly is refused

2  when the mark "so resembles" a registered mark or a prior common-law mark or

3  trade name that it is likely to cause confusion.  15 U.S.C. § 1052(d); 4 McCarthy

4  § 20:14.  Defendants' four pending trademark applications are for categories of

5  goods and services that are even broader than the on-demand entertainment and

6  television services they purport to offer in their marketing materials.  They

7  encompass a vast range of computer-based goods and services, "integrated

8  computerized televisions and displays capable of operating as a television, a

9  display and a computer" (Serial No. 85/143756); "display sets," (No. 77/912, 745);

10  "electronic transmission of voice, data and images by television and video

11  broadcasting or narrowcasting" (No. 77/827, 404); and "home theater equipment,

12  products and components" (No. 77/978,580).  Defendants' use of the

13  ACTIVISION mark on these broad categories of goods and services not only is

14  likely to confuse consumers, but also includes goods and services that are either

15  within Activision's current product line or within its logical zone of expansion.

16  Accordingly, registration of these applications should be denied.

## Conclusion

17
18      As set forth above, the undisputed evidence, including Defendants' own

19  admissions, confirm that each and every one of the relevant factors weigh in favor

20  of a finding of likelihood of confusion.  In fact, here the Defendants have openly

21  admitted their intent to trade off the goodwill of the senior user, the relatedness of

22  the products, the existence of confusion, and their plans to capture a market

23  properly belonging to the senior user.  The Court should enter summary judgment

24  on the First, Second, Fourth, and Sixth Claims for Relief.

25  DATED:  June 3, 2013              MITCHELL SILBERBERG & KNUPP LLP

26

27                                   By:    /s/ Marc E. Mayer

28                                          Marc E. Mayer
                                            Attorneys for Plaintiff