PATRICIA H. BENSON (SBN 60565)
   phb@msk.com
MARC E. MAYER (SBN 190969)
   mem@msk.com
NAOMI STRAUS (SBN 287804)
   nxs@msk.com
MITCHELL SILBERBERG & KNUPP LLP
11377 West Olympic Boulevard
Los Angeles, CA  90064-1683
Telephone:  (310) 312-2000
Facsimile:   (310) 312-3100

Attorneys for Plaintiff
Activision Publishing, Inc.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ACTIVISION PUBLISHING, INC., a Delaware Corporation,<br><br>              Plaintiff,<br><br>       v.<br><br>ACTIVISION TV, INC., a Delaware Corporation; AD MEDIA DISPLAYS, INC., a Wyoming Corporation; DAVID GOTHARD, an individual,<br><br>              Defendants. | CASE NO. CV12-8964-GW (JEMx)<br><br>Honorable George H. Wu<br><br>**DECLARATION OF DAVID OXFORD IN SUPPORT OF PLAINTIFF ACTIVISION PUBLISHING, INC.'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date:        July 1, 2013<br>Time:       8:30 a.m.<br>Ctrm.:      10 |

Mitchell
Silberberg &
Knupp LLP

**DECLARATION OF DAVID OXFORD**

# DECLARATION OF DAVID OXFORD

I, David Oxford, declare as follows:

1.      I am the Executive Vice-President and General Manager of Activision Publishing, Inc. ("Activision").  I have been employed by Activision since 2000. In my role at Activision, I am responsible for overseeing the development of a variety of Activision titles, including a vast range of licensed titles such as "Shrek Smash N' Crash Racing," "The Amazing Spider-Man," and "Golden Eye 007."  I also have broad knowledge of Activision's overall licensing and marketing activities.

2.      I make the following declaration based on my personal knowledge or on my review of business records maintained by Activision in the ordinary course of business.  If called as a witness, I could and would completely testify to the matters set forth in this declaration.

## Activision's Licensing Activities

3.      Over the 30 years that it has been in business, Activision has published hundreds of video game titles.  Many of Activision's titles are movie or television tie-ins, in which Activision has licensed a pre-existing property for use in the video game.  Among the motion picture, television, and comic book properties licensed by Activision include James Bond, the Marvel superhero universe (including Spiderman and X-Men), Star Trek, and Kung-Fu Panda.

4.      In addition to licensing preexisting properties for its video game products, Activision also licenses its corporate brand and its games to third parties

1    to manufacture and distribute a variety of products.  These include (but are not

2    limited to) the following:

3

4            (a)    Toys and Consumer Products.  Activision licenses its brands for

5    a variety of toys and other consumer products, such as Skylanders-branded

6    flashlights, walkie-talkies, cameras, lunchboxes, backpacks, building sets, plush

7    toys, jigsaw puzzles, and party favors; Call of Duty-branded dog tags, shot glasses,

8    bottle openers; and Guitar Hero action figures.  Images of certain of these products

9    are attached hereto as **Exhibit 1**.  Activision also has licensed its brand and its

10   games for several "plug-and-play" "Activision TV" game consoles that, when

11   plugged into a television set, allow the user to play 10 classic Activision games.

12   Images of these consoles are attached hereto as **Exhibit 2**.

13

14           (b)    Books and Paper Goods.  Activision licenses many of its

15   properties for books and other printed materials.  Activision has an exclusive

16   relationship with Brady Games for the publication of strategy guides for its games.

17   Activision also has licensed its properties for novels, comic books, and activity

18   books, including a series of Skylander's novels and sticker books, Guitar Hero

19   songbooks, and Call of Duty posters and decals.  Images of exemplars of these

20   products are attached hereto as **Exhibit 3**.

21

22           (c)    Clothing.  Activision licenses its own brand, as well as that of

23   its games, for a variety of clothing, such as T-shirts, hats, belt buckles, and

24   sunglasses.  Images of exemplars of these products are attached hereto as **Exhibit

25   4**.

26

27           (d)    Computer Peripherals and Game Consoles.  Activision has

28   licensed its games and other related assets for a variety of computer peripherals

and other products, including Xbox, Sony and Nintendo consoles, headsets, computer mice and trackpads, and USB flash drives.  Images of exemplars of these products are attached hereto as **Exhibit 5**.

(e)    <u>Arcade Kiosks</u>.  Over the years, Activision has licensed its games for video arcade kiosks, including kiosks for "Pitfall!" and "Guitar Hero." A true and correct copy of portions of Activision's license agreement with Konami for the "Guitar Hero" arcade console is attached hereto as **Exhibit 6**.  Images of the "Pitfall" and "Guitar Hero" arcade consoles are attached as **Exhibit 7**.

5.    All of Activision's licensed products bear the ACTIVISION name somewhere on the packaging of the product, generally also with the phrase (or a variant of the phrase) "ACTIVISION is a registered trademark of Activision Publishing, Inc."

6.    In addition to the foregoing, Activision enters into licenses or other agreements with respect to the distribution or use of its games in various platforms. For example, Activision permits its games to be made available to the public by rental and lending by services such as Redbox and Gamefly, by hotels and resorts in dedicated game rooms or arcades, and by mobile game trucks that offer services to parties and other events.

7.    In the mid-1990s, Activision licensed its game "Shanghai II" for on-demand play on airplanes and in hotels via the Nintendo Gateway System.  A true and correct copy of portions of Activision's license agreement with Nintendo in connection with the Nintendo Gateway System is attached as **Exhibit 8**.  It is my understanding that Shanghai II ultimately was incorporated on the Nintendo Gateway System and made available for on-demand play on several airlines.

3

**<u>Activision's Marketing and Advertising Activities</u>**

8.      Over the past five years, Activision has spent, on average, over $500 million each year on marketing and advertising its products.  Its advertising activities take a variety of forms, including the following:

9.      <u>Television</u>.  Television advertising comprises the largest portion of Activision's overall advertising budget.  Television advertisements for "Call of Duty" have played during popular evening and late-night television programs on the three major networks and on cable channels such as FX, SyFy, and USA. Advertisements for "Skylanders" have played during children's programming on channels such as the Cartoon Network.  "Call of Duty" advertisements have featured prominent Hollywood talent, such as Robert Downey, Jr., Sam Worthington and Jonah Hill.  Each of these television advertisements incorporates the ACTIVISION logo and trademark.

10.      <u>Internet Marketing</u>.  Activision spends in excess of $5 million each year on Internet-related marketing and advertising.  This includes banner advertisements, Google keyword purchasing, and website "skins" (e.g. where the background of the website is an advertisement for the product).  Activision also creates and distributes a variety of promotional video content over the internet, including teaser trailers, full-length trailers, and gameplay trailers and demos. Activision maintains a highly visible, high-quality website at www.activision.com. The Activision website serves as a portal or hub to Activision's product websites. These websites typically feature detailed descriptions of the game, screenshots and game artwork, video previews, links to press about the game, and links to locations where the game can be purchased or pre-ordered.  The Activision logo appears on

1   the Activision website and its product websites.  Screen captures reflecting the

2   content of selected pages of the Activision website are attached as **Exhibit 9**.

3

4       11.     Sponsorships.  Activision from time to time sponsors sports, musical,

5   and other events.  For example, in 2008 Activision sponsored the American Idol

6   Tour, and in 2009, Activision sponsored the Notting Hill Carnival music festival.

7   In 2009, Activision sponsored the Wolverine exhibit at the Edinburgh Zoo to

8   promote its video game "X-Men Origins: Wolverine."  Activision also has

9   sponsored major league sporting events.  As a sponsor of these events, Activision

10  places its logo on baseball or hockey stadiums and purchases advertising time on

11  large screens at such events.  Activision has also sponsored other events, such as

12  the "Tony Hawk's Underground 2 Presents Boom Boom HuckJam" event, which

13  was an action sports event program sponsored by Activision that included a one-

14  hour special that aired as a part of the Super Bowl XXXIX pre-game

15  programming.

16

17      12.     Trade Shows and Conferences.  Activision attends and offers booths

18  at a number of game industry trade shows such as the Electronic Entertainment

19  Exposition (E3), the Game Developers' Conference, Gamescom, the Tokyo Game

20  Show, and the Consumer Electronics Show.  Other conferences in which

21  Activision has attended or made presentations are the Ad Age Digital Conference,

22  the Salesforce.com conference, the Deutsche Bank Securities Technology

23  Conference, the Mobile Gaming & Tablet Conference, the Merrill Lynch

24  Computer Services Conference, and Cloud Gaming USA.

25

26      13.     Television Promotions and SmartTVs.  Activision has also partnered

27  with television makers to promote Activision games.  In 2012, Activision partnered

28  with television manufacturer LG to showcase Activision's Call of Duty: Black Ops

1  II video game on the new LG IPS7 monitor.  Activision is exploring future

2  partnerships with television makers, including the inclusion of Activision games on

3  Smart TVs.

4

5       I declare under penalty of perjury under the laws of the United States of

6  America that the foregoing is true and correct.

7

8       Executed on this 3rd day of June, 2013, at Santa Monica, California.

9

10

11

12  David Oxford

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

5340548.1

EXHIBIT 1





























EXHIBIT 2



OPP 002219



OPP 002220



OPP 002221



OPP 002222



OPP 002223



OPP 002227



OPP 002228



OPP 002229



OPP 002230



OPP 002231





© 2004 JAKKS Pacific®, Inc. and the JAKKS Pacific logo
are trademarks of JAKKS Pacific®, Inc. Malibu, CA 90265

All included games are (C) 1982-2004 Activision, Inc and it's affiliates. Activision,
Freeway, Pitfall! and River Raid are registered trademarks of Activision, Inc.

The Ratings Icon is a trademark of the Entertainment Software Association.
All other trademarks and trade names are the properties of their respective owners.
Conforms to ASTM F963. Colors and content may vary from those shown.
MADE IN CHINA.

OPP 002233

# EXHIBIT 3



















EXHIBIT 4











EXHIBIT 5



















# EXHIBIT 6



3100 Ocean Park Boulevard
Santa Monica, California 90405
Tel:    310.255.2000
Fax:   310.255.2152
www.activision.com

Party:          Konami Digital Entertainment, Inc.
Product:        One (1) Guitar Hero III Arcade
Property:       Guitar Hero III
Deal Type:      Arcade License

LICENSE AGREEMENT

This License (this "**Agreement**") is entered into effective as of March 31, 2008 (the "**Effective Date**") by and between Activision Publishing, Inc., a Delaware corporation with offices at 3100 Ocean Park Boulevard, Santa Monica, California 90405 ("**Activision**"), and Konami Digital Entertainment, Inc., a company organized under the laws of Illinois, with offices at 2381 Rosecrans Avenue, Suite 200, El Segundo, California 90245 ("**Licensee**").

RECITALS:

A. Activision is engaged in the business of developing, publishing, licensing, selling and distributing video games and interactive entertainment software and video game products, and holds the rights to develop, manufacture, publish and distribute the interactive entertainment software products known as "Guitar Hero III",   the description of which is set forth on Schedule "A" attached hereto (the "**Property**") ;

B.    Licensee is engaged in the business of developing, producing, manufacturing, distributing and selling video arcade systems and entertainment software products.

C.    The parties entered into a Heads of Agreement dated as of March 31, 2008 (the "**HOA**") with respect to Licensee obtaining a license from Activision to convert the Property to a format for use with a coin-op arcade game machine (the "Converted Platform") and to develop, produce, manufacture, advertise, promote and distribute the Product (as such term is defined below), on the terms and conditions set forth therein.

D.    The parties now desire to enter into a Formal Agreement (as such term is defined in the HOA) with respect to the subject matter of the HOA on the terms and conditions set forth herein.

AGREEMENT:

NOW, THEREFORE, the parties do hereby agree as follows:

1        **GRANT OF RIGHTS:**

1.1        Activision hereby grants to Licensee, and Licensee hereby accepts,   the exclusive non-assignable right and license, without right of sublicense, to:   (a) convert the Property to a format for use on the Converted Platform for one (1) coin-op arcade game (the "**Product**") in both a standard version with a 25"-27" monitor (the "**Standard Cabinet Version**") and a deluxe version with a 39"-42" monitor (the "**Deluxe Cabinet Version**"); and (b) to manufacture, distribute, advertise, promote, market and sell finished goods units of the Product (i) solely in the Territory (as defined in Section    3), and (ii) during the Term (as such term is defined in Section 4).   For the avoidance of doubt, Activision shall not license any third party the right to release a coin-op arcade game based on any Guitar Hero III enhancements, upgrades, expansions or any Guitar Hero game based on Guitar Hero III software code, (e.g., Guitar Hero: Aerosmith) but, for clarity, excluding sequels to Guitar Hero III (e.g., Guitar Hero IV), during the Term of this Heads of Agreement, subject to Section 4A below.

1.2        For the avoidance of any doubt, the rights granted to License in Section 1.1 shall be specifically

~8894378                                1                                CC

CONFIDENTIAL
OPP 1522

limited to the Converted Platform and shall not extend to any other device, platform, operating system or distribution method, pursuant to which interactive entertainment software may be delivered to or accessed by end-users, including, but not limited to, the following: (a) any devices that are principally used for voice or text communication, such as mobile or cellular telephones and combination mobile/cellular telephones and personal digital assistant-wireless telephone devices generally known as "smart phones" or "convergent devices"; (b) traditional entertainment software console platforms, such as Sony PlayStation2 and PlayStation 3, Microsoft Xbox 360, and Nintendo Wii; (c) desktop or laptop computer systems, such as PC Windows, Macintosh, Linux or Lindows operating systems; (d) any hand-held dedicated gaming devices, such as Nintendo Dualscreen, Sony PSP, Nokia N-Gage and Tiger Electronic hand-held games; (e) interactive toys; and (f) television, whether via cable, satellite, set-top boxes or other on-demand service.    Except as otherwise specifically stated herein with respect to the Product, Licensee shall have no right to develop, manufacture, reproduce, distribute, sell or exploit any other products based on the Property, including, but not limited to, entertainment software or video game products.    Activision expressly reserves and retains any and all rights that are expressly excluded from or not specifically granted to Licensee pursuant to this Agreement.

1.3    Except as set forth in this Agreement or otherwise expressly authorized in writing by Activision, Licensee shall not have the right to (and shall not permit any other party, including subdistributors): (a) license or sublicense the Property or the Product; (b) enter into an agreement for the bundling, OEM or sale of the Product in connection with hardware, software or any other products (other than the Converted Platform), devices or services offered by third parties.    In the event Licensee desires to distribute the Product as part of an OEM, it shall notify Activision in advance in writing of Licensee's intent to do so and shall provide Activision with an estimate of the number of units of the Product to be distributed via this OEM or bundling method and such OEM or bundling of the Product shall be subject to Activision's prior written approval; (c) distribute the Product via the Internet or any other method of electronic transmission; or (d) disclose or transfer to any third party the source code of the Property or the Product.

2    **DEVELOPMENT OF THE PRODUCTS:**



~8894378                                    2                                        CC

**REDACTED**

CONFIDENTIAL
OPP 1523



**14   NOTICES:**

14.1   All notices, statements and payments to Licensee shall be delivered to it at the address specified on the first page of this Agreement, or at such other address as it shall designate in writing by notice given in accordance with this Section from time to time.   All notices, statements and payments to be given to Activision shall be delivered to the undersigned at the address specified on the first page of this Agreement, to the attention of the Senior Vice President and General Counsel, or at such other address as it shall designate in writing, by notice given in accordance with this Section from time to time.   All notices shall be in writing and shall either be served by personal delivery, certified mail return receipt requested, or internationally recognized overnight courier service, all charges prepaid.   Except as otherwise provided herein, such notices shall be effective only after the actual receipt thereof.

**ACCEPTED AND AGREED TO:**

**ACTIVISION:**                                              **LICENSEE:**

ACTIVISION PUBLISHING, INC.                       KONAMI DIGITAL ENTERTAINMENT, INC.

By: _____                        By: _____

Name:   **Greg Deutsch**                                   Name:   Kazumi Kitaue
        **Senior Vice President and General Counsel**

Title: _____                       Title:   CEO & Chairman

                                                                          12 / 24 / 2008

**SCHEDULE A**

The "**Property**" is herein defined as Activision's *Guitar Hero III* interactive entertainment software product excluding the following:   music, Gibson guitars and trademarks, Havok technology, Bink technology, F-Mod technology, Massive ad client technology, proprietary Microsoft Xbox 360 materials, the Z-Dive venue and the Xavier Stone

~8894378                                12                                         *CC*

**REDACTED**

CONFIDENTIAL
OPP 1533

# EXHIBIT 7





# EXHIBIT 8

## NINTENDO OF AMERICA INC.

### CONFIDENTIAL
### NINTENDO GATEWAY SYSTEM
### LICENSE AGREEMENT

THIS AGREEMENT is entered into by and between **NINTENDO OF AMERICA INC.**, a corporation of Washington, having an address for notice purposes of 4820 - 150th Avenue N.E., P.O. Box 957, Redmond, Washington 98052, Attn: General Counsel (Fax: 206-882-3585) ("NINTENDO"), and **ACTIVISION, INC.**, a corporation of Delaware, having an address for notice purposes of 3100 Ocean Park Blvd., Santa Monica, California 90405, Attn: Vice President, Business Affairs and General Counsel (Fax: 310-255-2100)  ("LICENSOR").

1.  RECITALS

    1.1    NINTENDO markets and sells high quality home video game systems, including the *Super NES* ( the "Game System"), which has been adapted for use in non-coin-activated commercial settings, including commercial aircraft, hotels and other similar venues.

    1.2    LICENSOR has developed and is the owner of copyrights in various video games designed for play on the Game System.

    1.3    NINTENDO desires to license and sell certain video games developed by LICENSOR for play on the commercially adapted Game System.

    1.4    LICENSOR is willing to grant such rights to NINTENDO upon the terms and conditions set forth in this Agreement.

    NOW, THEREFORE, the parties agree as follows:

2.    DEFINITIONS

    2.1    "Effective Date" shall mean October 2, 1997.

    2.2    "Game Term" shall mean the term provided for each Video Game at Schedule A.

    2.3    "Gateway Software Technical Requirements Manual" shall mean the specifications manual NGS-62-0107-001 prepared by NINTENDO's Engineering Department, including any revisions thereto, provided that Licensor has been made aware of any such revisions in advance.

    2.4    " Gateway System" shall mean the Game System adapted for use in non-coin-activated commercial settings.

    2.5    "Licensed Intellectual Properties" shall mean the trademarks and copyrights in the Video Games, excluding trademarks or copyrights owned by NINTENDO and/or NINTENDO's parent corporation, Nintendo Co., Ltd. ("NCL").

GAME LICENSE AGREEMENT FOR NINTENDO GATEWAY SYSTEM
12/19/97
Page 1

CONFIDENTIAL

2.6    "Licensed Users" shall mean third parties which have entered into agreements with NINTENDO related to the installation, service or use of the Gateway System.

2.7    "Notice(s)" shall mean all notices which either party may give under this Agreement, which shall be placed in writing and:  (a) personally served or delivered to the party entitled to such Notice; or, (b) transmitted by facsimile with an original sent concurrently by domestic or international air courier, addressed to the person, facsimile number, and address stated above, or to such other person, address or facsimile number as may be provided in a Notice by one party to the other.  Notice shall be deemed effective upon the earlier of actual receipt or five (5) business days after mailing or transmittal.

2.8    "Territory" shall mean the entire world.

2.9    " Video Game(s)" shall mean LICENSOR's video games identified at **Schedule A.**

3.    GRANT OF NON-EXCLUSIVE LICENSE

3.1    Grant.  LICENSOR hereby grants to NINTENDO the non-exclusive right to sublicense and distribute the Video Games for use on the Gateway System in the Territory, solely during the Game Term with respect to each applicable Video Game.  All rights not expressly granted herein are reserved to Licensor.

3.2    Amendment to Add Additional Video Games.  The parties may extend any Game Term or add additional Video Games to this Agreement by entering into an amended Schedule A.

3.3    Records Maintained By NINTENDO.  NINTENDO shall keep accurate and complete records with respect to the sublicense and distribution of the Video Games.

4.    ADAPTATION, ADVERTISING OF VIDEO GAMES

4.1    Adaptation by LICENSOR.  LICENSOR shall, at its own expense, modify each Video Game as specified in the Gateway Software Technical Requirements Manual.   NINTENDO shall provide LICENSOR with reasonable assistance in making these modifications.

4.2    Submission of Video Games.  LICENSOR shall submit the Video Games to NINTENDO for approval in accordance with the procedures set forth in the Gateway Software Technical Requirements Manual.

4.3    Development and Approval of Artwork.  LICENSOR will provide NINTENDO with camera ready artwork as specified in the Gateway Software Technical Requirements Manual, together with the appropriate trademark and copyright notices for each Video Game. NINTENDO and its Licensed Users shall have the right to use such artwork and the Licensed Intellectual Properties in connection with the advertising and promotion of the Video Games on the Gateway System. If such artwork is used in substantially the same form as that supplied by LICENSOR, neither NINTENDO nor its Licensed Users will be obligated to obtain approval from LICENSOR for such use.  If the artwork is substantially modified, NINTENDO shall submit the proposed modified artwork to LICENSOR prior to its use.  If LICENSOR does not respond to NINTENDO within five (5) business days of receipt of such modified artwork, the modified artwork shall be deemed approved.  NINTENDO and its Licensed

GAME LICENSE AGREEMENT FOR NINTENDO GATEWAY SYSTEM
12/19/97
Page 2

CONFIDENTIAL

OPP002399

EX 8    PG 54

which together shall constitute one agreement.  For the convenience of the parties, binding signatures to this Agreement may be transmitted by facsimile.


IN WITNESS WHEREOF, NINTENDO and LICENSOR have entered into this Agreement on the dates set forth below.

NINTENDO:                          LICENSOR:

NINTENDO OF AMERICA INC.           ACTIVISION, INC.

By:_____         By: _____

Its:_____        Its: Sr. V.P.

Date:_____         Date: __12/19/97__

GAME LICENSE AGREEMENT FOR NINTENDO GATEWAY SYSTEM
12/19/97
Page 5

CONFIDENTIAL

OPP002402

EX 8    PG 55

MAR. 29. 2000  4:18PM    NINTENDO OF AMERICA                    NO. 9981   P. 2

AMENDED SCHEDULE A
Nintendo Gateway System License Agreement
Activision, Inc.
Video Games/Royalty/Game Term

| Video Game | Game System | Game Term |
|------------|-------------|-----------|
| Shanghai II/Dragon's Eye | SNES (NTSC) | October 2, 1997 to December 31, 2010 |

LICENSOR acknowledges its prior receipt from NINTENDO of the full payment for the initial
three years of the Game Term, as set forth in the original Schedule A entered into by the parties
as of December 12, 1997, which is hereby replaced by this Amended Schedule A.

All other terms and conditions of the Nintendo Gateway System License Agreement between
LICENSOR and NINTENDO dated as of December 18, 1997 shall remain in full force and
effect.

This Amended Schedule A is entered into as of the date of the last signature set forth below.

NINTENDO:                                    LICENSOR:

NINTENDO OF AMERICA INC.                     ACTIVISION, INC.

By:                                          By:

Its:  EVP                                    Its:  VP, Business & legal Affairs

Date: 3/27/00                                Date: 3.10.00

C:\WINDOWS\TEMP\ActivisionAmendA.doc    2/18/2000

TOTAL P. 02

CONFIDENTIAL                                 OPP002404

EX 8    PG 56

EXHIBIT 9







