PATRICIA H. BENSON (SBN 60565)
  phb@msk.com
MARC E. MAYER (SBN 190969)
  mem@msk.com
NAOMI STRAUS (SBN 287804)
  nxs@msk.com
MITCHELL SILBERBERG & KNUPP LLP
11377 West Olympic Boulevard
Los Angeles, CA  90064-1683
Telephone:   (310) 312-2000
Facsimile:   (310) 312-3100

Attorneys for Plaintiff
Activision Publishing, Inc.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ACTIVISION PUBLISHING, INC., a Delaware Corporation,<br><br>          Plaintiff,<br><br>     v.<br><br>ACTIVISION TV, INC., a Delaware Corporation; AD MEDIA DISPLAYS, INC., a Wyoming Corporation; DAVID GOTHARD, an individual,<br><br>          Defendants. | CASE NO. CV12-8964-GW (JEMx)<br><br>Honorable George H. Wu<br><br>**DECLARATION OF DAVID TEITELBAUM IN SUPPORT OF PLAINTIFF ACTIVISION PUBLISHING, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Date:        July 1, 2013<br>Time:       8:30 a.m.<br>Ctrm.:      10 |

Mitchell
Silberberg &
Knupp LLP

5345375.1

1    I, David Teitelbaum, the undersigned, declare:

2

3    1.    I am the President of Anna Maria Island Resorts, LLC, ("Anna Maria
4    Island Resorts") located in Brandenton Beach, Florida. I have held this position
5    since April 1, 2009. I make the following declaration on my own personal
6    knowledge and based on my review of records maintained by Anna Maria Island
7    Resorts in the ordinary course of business. If called upon to do so, I could and
8    would testify truthfully to the matters set forth herein.

9    2.    In or around July 2011, David Gothard approached Anna Maria Island
10   Resorts with a proposal to install interactive television systems into hotel rooms at
11   the Anna Maria Island Resorts. In late 2011 and early 2012 Anna Maria Island
12   Resorts entered into various agreements with Activision Television, Inc. pursuant
13   to which Activision Television, Inc. was to install the "Activision™ System" at the
14   four Anna Maria Island Resorts Properties: Tortuga Inn Beach Resort, Tradewinds
15   Beach Resort, Sea Side Beach Resort, and Tropic Isle Beach Resort. Attached
16   hereto as Exhibit 1 is a true and correct copy of one of these agreements, which I
17   signed on behalf of Sea Side Resort Holdings, LLC, the entity that operates the Sea
18   Side Beach Resort.

19   3.    The "Activision™ System" has never been operational in any of the
20   Anna Maria Island Resort hotels. Activision TV and a local vendor installed
21   televisions and Activision TV boxes in the rooms at the Sea Side Beach Resort and
22   at the Tropic Isle Beach Resort, but that system has never been operational. No
23   televisions or Activision TV boxes were ever installed at Tortuga Inn Beach Resort
24   or the Tradewinds Beach Resort. Attached hereto as Exhibit 2 is a true and correct
25   copy of an email I sent to David Gothard on April 14, 2013 regarding Activision
26   TV's failure to install an operational system.

27   4.    During conversations with Mr. Gothard prior to April 15, 2013, he
28   told me that there was an operational "Activision™ System" that his company had

Mitchell
Silberberg &
Knupp LLP

5342735.2

1

**DECLARATION OF DAVID TEITELBAUM**

1   installed at the Queen Kapiolani hotel in Hawaii. I later was told by a third party

2   that the system at the Queen Kapiolani hotel was not, in fact, operational, and I

3   raised that matter in the above mentioned April 14, 2013 email, Exhibit 2 hereto,

4   (in which I referred to the Queen Kapiolani hotel as "QK"). He responded to me

5   by email dated April 15, 2013. Attached hereto as Exhibit 3 is a true and correct

6   copy of the April 15, 2013 mail I received from David Gothard.

7

8        I declare under penalty of perjury under the laws of the State of Florida that

9   the foregoing is true and correct.

10

11        Executed this 31 day of May, 2013, at Brandenton Beach, Florida.

12

13

14                    David Teitelbaum

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Mitchell
Silberberg &
Knupp LLP

5342735.2

2

**DECLARATION OF DAVID TEITELBAUM**

EXHIBIT 1

# Activision TV™

## The Real Interactive Solution

5400 Yahl St, Suite C, Naples, Florida 34109
Phone: 239-513-9016  Fax: 239-514-1212

## Concession and License Agreement

*→ Anna Maria Island Resort JR*

This Concession and License Agreement (Agreement) made by and between
Activision TV, Inc., ("Licensor") having its principal offices at 5400 Yahl Street,
Suite C Naples, Florida 34109 and Sea Side/Tropic Isles ("Licensee") having its
principal offices at 2200 Gulf Drive North, Bradenton Beach, Florida 34217.

1.    **Recitals.**

   1.1    *Licensor* is engaged in the commercial advertising, media,
marketing, and technology business and has developed
systems for advertising and media services, the **Activision™
System** (hereinafter **Activision**), involving the installation,
maintenance, service and presentation of digitally integrated flat
panel apparatuses **("Display Unit")** located in businesses,
convention centers, hotels, retail stores and other suitable
locations; and

   1.2    *Licensee* is familiar with the digitally integrated flat panel apparatus
and programmable advertising display equipment **("Display Unit")**
utilized by **Licensor** in connection with **Activision**; and

   1.3    *Licensee* is engaged in the hotel, lodging and communication
business and the lawful representative of numerous clients in
varying locations as listed in **Schedule A** (collectively, the
"**Locations**"); and

   1.4    *Licensor* desires to install a number of **Display Units** and operate
the **ATV System** at the **Locations;** and **Licensee** desires to grant
**Licensor** exclusive authority to install a number of **Display Units**
and operate the **ATV System** at the **Locations.**

1

AMI000021

2.    **Licensee.**

2.1    *Licensee* grants to **Licensor** the right and privilege to install **Display Units** and to operate the **ATV System** program at each **Location** for the **Term** of this **Agreement.** **Licensor** shall place such **Display Units** in the hotel rooms, lobby or other such locations in the hotel of each **Location**, or at an otherwise mutually acceptable **Location(s)** subject to the reasonable exercise of **Licensor's** discretion.

2.2    The license granted under this **Agreement** shall be exclusive to the **Licensor**, and **Licensee** expressly covenants that it shall not, during the term of this **Agreement**, grant any other person, business or other entity or enterprise any right to conduct commercial television and advertising with respect to the **Locations** by any means or any manner which is similar to, or the substantial equivalent of , the **Activision™ System** program conducted by the **Licensor;** and, further, that **Licensee** shall not during such term, whether of or by its own accord, conduct commercial advertising with respect to the **Locations** by any means or in any manner which is reasonably similar to, or the substantial equivalent of, the **Activision™ System** program conducted by the **Licensor.**

3.    **Term.**

3.1    *Base Term.*  The term **("Term")** of this **Agreement,** shall commence upon the date listed in **Section 9** (the "**Commencement Date**") and unless sooner terminated in accordance with **Section 7**, shall terminate upon the date ("**Termination Date**") which is Sixty (60) months subsequent to the first date upon which **Licensor** installs any given **Display Unit** in respect of any **Location**.

3.2    *Extended Term.*  Subject to the mutual written agreement of **Licensor** and **Licensee** sixty (60) days prior to the **Termination Date**, the **Term** of this **Agreement** may be extended beyond the **Termination Date** for one  or more additional one-year periods.

4.    **Installation and Service of Display Units.**

4.1    *Installation.*  **Licensor** will at its own expense and without additional charge or fee to the **Licensee,** facilitate the "standard" installation of the Display Units at the **Locations**, including such mechanical, electrical, and communication construction necessary to install the Display Units in a workmanlike manner at the respective **Locations** in accordance with applicable building and electrical regulation and requirements per **Installation and Service Agreement**.  Upon completion of the **Site Preparation** activities, **Licensor** will install the Display Units and complete the ATV

2

AMI000022

EX 1    PG 4

**System** setup and integration procedures. **Licensor** will pay for all shipping and handling fees to each location.

4.2 ***Permits.*** **Licensor** will at its own expense and without additional charge or fee to **Licensee**, obtain all permits, certificates, or other approvals required by any state or local governmental authority in connection with installation and operation of the **Display Units**. Upon the written request of **Licensor**, **Licensee** will promptly furnish materials relating to the **Locations** required for the purpose of obtaining any such approval by governmental authorities; provided that the **Licensor** will maintain any such information or materials in complete confidence, will use such information and materials for the sole purpose of obtaining such approvals, and will not disclose the nature or terms of such information or materials, except such disclosure as may be required by **Licensor's** attorneys, accountants or other business consultants and/or required by the governmental authority.

4.3 ***Service.*** **Licensor** will at its own expense and without additional charge or fee to **Licensee**, service each **Display Unit** in such a manner to maintain it's good working condition and repair; provided that **Licensee** shall undertake the activities of periodic upkeep set forth in **Section 4.4** and **4.5** of this **Agreement**.

4.4 ***Repair.*** **Licensee** will with due diligence report to **Licensor** all conditions, instances and occurrences requiring repair of the **Display Units**. Within 48 hours of any such report, **Licensor** will, at its own expense and without additional charge or fee to **Licensee,** complete such service sufficient to maintain the good working condition of the **Display Units**. For the purpose of this **Section 4.4**, a condition, instance or occurrence requiring repair shall include, but not necessarily be limited to, the malfunction of any electrical system, computer electronics, visible structural damage and software problems.

4.5 ***Basic Maintenance, Electrification, and Communication***. During the **Term** of this **Agreement, Licensee** shall, without charge or any fee to **Licensor,** provide for the electrification of each **Display Unit**; provide communications connections for the operation of each **Display Unit**; and maintain each **Display Unit** in a clean and sanitary manner and shall on a monthly basis, or as needed, clean the exterior surfaces of each **Display Unit**.

4.6 ***Advertising Materials***.

(a) **Source and Placement**. On a monthly or periodic basis, **Licensor** will load hotel media content at the request of **Licensee** at the prevailing rates.

3

AMI000023

EX 1    PG 5

(b) **Certificate of Placement**.  After placement of the Ad Copy or
content in accordance with **Section 4.6 (a)**, the **Licensee's**
designee at each **Location** shall promptly notify **Licensor** by
phone or e-mail if said placement of materials is incorrect.

4.7    *Coordination*.

(a) **Cooperation.  Licensee** will cooperate fully and in good faith
with **Licensor** for the purpose of installation, maintenance and
repair of the **Display Units.  If applicable, Licensee** agrees to
cooperate with the **Licensor**, in keeping the **Licensor** informed of
any problems.

*(b)* **Planning**.  Within thirty (30) days after the **Commencement
Date, Licensor** will furnish to **Licensee** a proposed schedule for
installation of the **Display Units** among the **Locations**.  Subject to
approval by the **Licensor**, the **Licensor** and **Licensee** will together
complete a final **Installation Schedule** that shall constitute, serve
and operate **Licensee's** notice to proceed with installation of the
**ATV SYSTEM** and said Schedule shall become part of this
Agreement.  **Licensor** and **Licensee** hereby acknowledge that
deviation from the **Installation Schedule**, for various reasons
beyond their respective control, may occur and that any such
deviation there from shall not be actionable or otherwise constitute
or are construed as a breach of this **Agreement**.

(c) **Project Manager**.  **Licensee** will designate in writing to the
**Licensor** one (1) individual and **Licensor** will so designate one (1)
individual (the "**Project Managers**"), to serve as the respective
authorized representatives for the purpose of coordinating
installation of the **Display Units** in accordance with **Installation
Schedule**. Among other things, the **Project Manager** will have
authority to communicate with appropriate management personnel
situated among the **Locations**, to review and authorize
amendments to the **Installation Schedule**, to furnish to the **Parties**
any information and materials necessary in connection with
required permits or other governmental approvals, and to assist in
resolving unforeseen problems.

4.8    *New, Relocated and Terminated and Locations*.

(a) **General Acknowledgement. Licensor** and **Licensee** agree
and acknowledge the number and address of the **Locations** set
forth in **Schedule A** may from time to time decrease or increase by
reason of **Licensor's** business judgment to begin or to relocate
occupancy and operation of one (1) or more additional such
**Locations**, and/or to cease its operation of one (1) or more such
**Locations**, as the case may be.

(b) **Option to Install**.  In the event **Licensee** commences
occupancy and operation of any such new or additional **Locations**

4

AMI000024

during **Term** of this **Agreement**, **Licensee** will in advance, provide **Licensor** with reasonable notice of such new or relocated **Locations** and **Licensor** may, at its option, elect to install the **Display Units** with regard to such **Locations** in accordance with the provisions of this **Section 4**.

(c) **Removal of Display Units**. In the event **Licensee** ceases occupancy of any such **Location** during the **Term** of this **Agreement**, **Licensor** will remove the **ATV System** installed at such **Location** and restore such **Location** to the condition reasonably comparable to that condition in which such **Location** existed prior to installation of the **Display Units**.

5.    <u>**Concession Fees**</u>.

5.1    *Advertising and Use Concessions; Licensor.* The **Licensor** will endeavor to engage in a commercial concession and related business in each **Display Unit** installed.  Within twenty (20) days of the last business day of each quarter during the **Term** of this **Agreement**, **Licensor** will furnish to the **Licensee** a statement setting forth with respect to such quarter, (i) the Number and **Location** of each **Display Unit** installed and (ii) the number of **Locations** of each such installed unit with respect to which **Licensor** has engaged in the commercial concession (each such unit referred to as **"Engaged"**).

5.2    *Advertising Concessions; Licensee.*  As consideration for **Licensee** obtaining **Display Units** and sharing in the revenue with **Licensor**, **Licensor** will negotiate a revenue sharing program on each **Display Unit**. **Licensee** further agrees to execute a **Master Equipment Lease Agreement** with **Licensor** for the **Display Units** to run concurrently with the **Concession** and **Lease Agreement**.  **Licensee** agrees to assist **Licensor** in securing **Ad Copy** advertisers for the product space.

5.3    *Adjusted Gross Revenue.* The term **"Adjusted Gross Revenue"** will mean all **Ad Copy** and **Product Display Revenues** received monthly on each **Display Unit** less any advertising fees.

5.4    *Surplus Concessions.*  **Licensor** may elect to place public service **Ad Copy** in any **Display Unit** not engaged during any month; provided, however, that "Public Service" for this purpose means **Ad Copy** promoting the programs and efforts of a not-for-profit charitable organization recognized in accordance with Section 501 (c)(3) of the Internal Revenue Code of 1986, as amended from time to time, or an agency of the United States Government, or the government of any state or any political subdivision of any state.

5.5    *Payment of Concession Fees.*  **Licensee** and **Licensor** agree to pay each month's **Concession Fee** at the end of each calendar

5

AMI000025

EX 1    PG  7

month (see **Schedule B**). Additionally, **Licensee** agrees to pay as a security deposit of $200.00 per **Display Unit** prior to the installation of each **Display Unit** to be held in a security deposit until the termination of this **Agreement**.  Under the terms of this **Agreement**, **Licensee** agrees to collect on behalf of **Licensor** a nightly fee of $2.95 per occupied room for the use of the **ATV Systems** standard package (see **Schedule B**).

6.    **Independent Contractor.**

6.1    ***Status.***    Neither this **Agreement**, nor performance by **Licensor** pursuant to this **Agreement**, shall constitute **Licensor** as an agent, legal representative, joint venture, partner, employee, or servant of **Licensee**, for any purpose whatsoever. **Licensor** is an independent contractor and is in no way authorized to make any contract, agreement, warranty or representation on behalf of **Licensee**, or to create any obligation, expressed or implied, on behalf of **Licensee**.

6.2    ***Indemnification.***    **Licensee** will not be liable for any act, omission, debt or other obligation of **Licensor**, and **Licensor** will indemnify, save and hold harmless any such claim arising directly or indirectly from, or as a result of, or in connection with **Licensor's** performance under this **Agreement**.

6.3    ***Compliance with laws.*** **Licensor** and **licensee** will each comply with all laws, ordinances, rules and regulations pertaining to the **Display Units** and its performance under this **Agreement** and, in accordance with the provisions of **Section 6.2** of this **Agreement**, will save and hold each other harmless against any fine, penalty, or damage for any actual or alleged failure on the part of either to comply therewith.

6.4    ***Property.*** Except as otherwise provided under this **Agreement**, **Licensee** will have no responsibility other than to keep anything from blocking the visibility of the **Display Units** and related properties or the **Licensor**. The **Licensor** will constitute the sole owner of the **Display Units** installed in accordance with the provisions of **Section 4.1** of this **Agreement**, the **Ad Copy** furnished in accordance with **Section 4.6** of this **Agreement**, and permits, certificates, or other approvals procured in accordance with the provisions of **Section 4.2** of this **Agreement** (collectively, the "**Property**"). Nothing contained in this **Agreement** vests, or will be construed to vest, in **Licensee** any proprietary interest of any nature, sort or description in the **Property**.

6.5    ***Advertising Engagements.*** **Licensee** agrees to work with and support **Licensor** with respect to engagement of advertising and support services for the **Display Units**.

6

AMI000026

6.6    *Insurance*.

(a) **Installation**. **Licensor** will, either directly at its own expense or indirectly through its hired contractors, procure and maintain in full force all necessary insurance coverage including, as the case may be, statutory workman's compensation coverage, social security, unemployment and any other forms of insurance required by law in respect of the installation of the **Display Units** at the **Locations**.

(b) **Operation**. From and after the first date upon which **Licensor** installs any **Display Unit** in respect of any **Location**, **Licensee** will at its own expense procure and maintain in full force during the **Term** of this **Agreement**, including any extensions thereof, comprehensive or general liability insurance covering (i) bodily injuries in amounts not less than $100,000 per occurrence and $2,000,000 in the aggregate; (ii) property damage in amounts not less than $250,000 per occurrence and $1,000,000 in the aggregate; and (iii) personal property damage in amounts not less than $1,000,000 per occurrence and $2,000,000 in the aggregate.

Upon **Licensee's** written request, **Licensor** will furnish in evidence written certificates of the insurance coverage specified and required pursuant to **Section 6.6**.

7.    <u>**Termination.**</u>

7.1    *Events of Termination*.

(a) **Enumeration.** Notwithstanding any provision herein to this contrary, this **Agreement** shall terminate upon the occurrence of any of the following events:

7.1.1    If for any reason, excluding those caused by **Licensee**, **Licensor** does not begin the installation of **Display Units** in respect of the **Locations** within sixty (60) days subsequent to the **Commencement Date**.

7.1.2    Through no fault or other negligence caused by **Licensor**, **Licensor** reasonably determines that any governmental authority will not honor its application or will not issue any permit, certificate, or other approval thereby in connection with installation and operation of the **Display Units**. This would be limited to only the affected **Location(s)** and have no bearing on its installation in other **Locations** or of other **Display Units**.

7.1.3    **Licensee** fails to furnish to **Licensor** in a timely manner all information, documents, plans, renderings, drawings or other such materials relating to the **Locations** required for the purpose of obtaining any permit, certificate, or other approval required by any governmental authority in connection with installation and operation of the **Display Units**; or

7

AMI000027

EX 1    PG 9

7.1.4 **Licensor** fails for any two (2) or more consecutive calendar months, to pay **Licensee** in respect of concession fees made payable to the provisions of **Section 5** of this **Agreement**. **Licensor** would remain obligated to make whole any of the remaining concession fees and **Licensee** will be liable for any remaining guaranteed concession fees on this Agreement.

7.1.5 **Licensee** fails for any two (2) or more consecutive calendar months, to pay **Licensor** in respect of concession fees made payable to the provisions of **Section 5** of this **Agreement**. **Licensee** would remain obligated to make whole any of the remaining concession fees and **Licensor** will be liable for any remaining guaranteed concession fees on this Agreement.

7.1.6 Occurrence of the **Termination Date** without written provision by the parties for extension of this **Agreement** in accordance with its terms.

*(b)* **Effective Upon Notice.** Any termination of this **Agreement** provided under this **Section 7.1** will be effective upon written notice of one party by the other party.

7.2 *Material Breach.* Except as otherwise provided under **Section 7.1** of this **Agreement**, **Licensor** or **Licensee** may effect the termination of this **Agreement** upon the failure of the party to cure any material breach on or before the date which is ninety (90) days from and after the giving of effective notice of such material breach.

7.3 *Obligations upon Termination.*
(a) **Licensor**. Upon termination of this **Agreement**, **Licensor** will (i) at its own expense, remove each **Display Unit** installed at the **Locations**; (ii) restore each such **Location** to the condition reasonably comparable to that condition in which such **Location** existed prior to installation of the **Display Units**; and (iii) render when due any amount payable to the **Licensee** for concession fees for the **Display Units** engaged up to the time of termination.

(b) **Licensee**. Upon the termination of this **Agreement**, **Licensee** will cooperate fully and in good faith with **Licensor** with respect to **Licensor's** performance of its obligations arising hereunder upon such termination. Further, **Licensee** will cooperate fully and in good faith in returning to the possession and control of **Licensor** any property or other valuable chattel, documents, instruments or other materials owned by **Licensor**.

7.4 *Cross-reference.* Nothing contained in this **Section 7** shall be construed to impair or otherwise modify the provisions of **Section 4.8** of this **Agreement**, such provisions relating to new, relocated, and terminated **Locations**.

8

AMI000028

EX 1    PG 10

8    **General Provisions.**

8.1    *Intent to Bind and Assignment.* This **Agreement** is intended to bind the parties hereto and their respective successors and assigns for the duration of this **Agreement** and any extensions thereof.

8.2    *Amendment and Waiver.* This **Agreement** may be amended or modified in writing only and no such amendment or modification shall be effective for any purpose unless signed by the party against whom enforcement is sought. Any delay or failure by **Licensor** or **Licensee** to exercise any right upon breach or default of the other party, or to accept any payment hereunder, shall constitute a waiver of that or any other right provided herein unless expressly provided to the contrary therein.

8.3    *Governing Law and Disputes.* This **Agreement** shall be governed, interpreted and construed in accordance with the laws of the State of Florida. Any dispute, controversy, or claim arising out of, in connection with, or relating to this **Agreement** will be settled by arbitration in Collier County Florida, in accordance with the rules and procedures of the American Arbitration Association.

8.4    *Notices.* All written notices, requests, and demands to be given in respect of this **Agreement** shall be deemed effective upon delivery by hand, telegram, fax, mail or courier service guaranteeing overnight delivery, or upon deposit into the first class registered US Mail, with postage prepaid, addressed:

8.4.1    To Licensee:    Sea Side Inn Beach Resort
2200 Gulf Drive North
Bradenton Beach, FL 34217

8.4.2    To Licensor:    Activision TV, Inc.
5400 Yahl St, Suite C
Naples, FL  34109

8.5    *Severability and Terms.* If any term or provision of this **Agreement**, or any application thereof, is deemed to be invalid or unenforceable for any reason, such term provision or application will be deemed modified to the extent necessary to make it valid and operative, or if it cannot be so modified, then severed and the remainder of the **Agreement** shall continue in full force and effect as if the **Agreement** had been executed with the invalid portion so modified or eliminated. All terms used in this **Agreement**, regardless of number in which used, will be deemed and construed to include any other number, singular or plural, and the context or sense that this **Agreement** may otherwise require.

9

AMI000029

EX 1    PG 11

8.6 **Entire Agreement.** This Agreement and any schedules or attachments annexed hereto, constitute the entire Agreement of the parties, relating to its subject matter.

8.7 **Time is of the Essence.** Time is of the essence for this Agreement.

8.8 **Force Majeure.** Neither party shall be responsible for failure or delay in the performance of any of its obligations hereunder due to force majeure. Force majeure shall be defined as (i) acts of God, (ii) the acts, the regulations or the laws of any government, (iii) wars, (iv) civil commotion, (v) acts of terrorism, (vi) destruction of production facilities or materials by fires, earthquakes or storms, (vii) labor disturbances, (viii) shortages of public utilities, common carries or raw materials, or (ix) any other causes or similar affect not the fault of the party delayed in performing acts required under the terms of the Agreement. During any such occurrence of force majeure, the period for the performance of such acts shall be extended for a period equivalent to the period of delay.

## 9 . Minimum Payment Guarantee

9.1 **Lease payments. Licensee** agrees to collect $2.95 per night for each occupied room on behalf of **Licensor** and deposit said funds on a weekly basis into a special account that has been established by the **Licensor**. These funds are guaranteed to be paid by **Licensee** to **Licensor** under the Lease Agreement for the duration of this Agreement.

All of the above is accepted by:

**LICENSOR:**

Activision TV, Inc.

Signed: _____

Title: _____

Date: _10/28/11_____

**LICENSEE:**
SeaSide Inn Beach Resort
Anna Maria Island Resort, LLC
for SeaSide Resort Holding LLC
Signed: _____

Title: _MANAGER_____

Date: _10/28/11_____

10

AMI000030

EX 1    PG  12

**Schedule A**
**Locations**

Sea Side Inn Beach Resort, 2200 Gulf Drive North, 10 rooms plus office

Tropic Isles Resort, ~~2200 Gulf Drive North~~, 14 rooms plus office

*101 22nd St*
*Both @ Bradenton Beach Fl 34217*

11

AMI000031

EX 1    PG  13

Schedule B

Concession Fees

Fees Due Licensor

In-Room Services: ~ — $2.95 per night stay
*in every room*

LCD-HD 37" Monitor          Included
Computer                    Included
WiFi Connection             Included
Printer*                    Included
USB connection              Included
**Software**                **Included**
**Server**                  **Included**
**Modems**                  **Included**

Fees Due Licensee

20%  30% of adjusted gross in-room revenue after lease payments
20%  30% of adjusted gross revenue from digital signage advertising

*customer charge*
* Limited to 10 free pages per day, thereafter, $.50 per page.

AMI000032

EX 1    PG  14

# EXHIBIT 2

From: David Teitelbaum <david@annamariaislandresorts.net>
Subject: Activision progress
Date: April 14, 2013 12:00:43 PM EDT
To: David Gothard <lockecgi@aol.com>
Cc: Barbara Baker <barbara@teitelbaumdevelopers.com>, Penelope Naylor
<penelope@teitelbaumdevelopers.com>

1 Attachment, 27 KB

David:

I apologize for blowing up at you yesterday.  I simply couldn't tolerate any more exaggerations, lies &
partial truths.

I understand your enthusiasm for your Activision project. It's your "Baby", however, what you have "in
hand" is different from what "is almost in hand". You know the difference.

Hawaii is NOT operational & it bothers me that you told me that it is.  Tom told me exactly where it
stands.  He met with QK Friday afternoon & reported to me.  I showed you his text. You need his
program (or a program like his) to make Activision work.

You do not have a signed deal with Tom Blankley, however you do have a verbal agreement that needs to
be funded. Just like you have an agreement with Penny to lease-buy her apartment, that is over one-year
overdue.

I didn't know you had hired Don Crowder to install at SeaSide.  And you told me all the items were
missing except for unit #5. Now it turns out it's not "all the items", just what is on the list you sent Dawn.
If I knew he was installing, we would have inspected his work when he was finished.

I've been extremely patient, kept all our owners agreements on hold & have been extremely supportive &
patient in my communication with them for over one year, buying time for you to get your operation
together.  You promised me that Activision would be operational Friday, 3/12 & that I would be able to
see it work.  Well, Friday came & went.

You don't have a program that works at this time!
I don't trust Richard's & his ability! He doesn't have what it takes to make this system operational!  You
told me Jim Peak was "on board", he could pull it all together. Is Jim Peak coming?

When will Activision be operational with all that it needs to provide (movies, etc)???

You are a great inventor/idea guy with an excellent Patent.  You are not a great operational guy & you
don't have someone that you can rely on. You are successful suing people who are violating your patent,
but that doesn't translate to day-to-day operational ability.

Activision is a great idea that needs to be put into service.  This requires an operations person equal to
your ability as a innovator.  Without this, Activision will not happen.

I'm a Marketing/Merchandising/Management guy with a ton of experience & success under my belt. I

can't allow my good reputation to be soiled at any cost! I'm also not a great Operational guy.  Barbara is a great operations person & that's is why she is the General Manager of all our companies.

Below is what I'm planning to write to our owners about Activision.  It doesn't hurt you & it makes it clear that it is not anything they can count on at this time.  I'm also removing all references to Activision on my websites, as I'm getting complaints from our guests for advertising a service that I'm not providing.

Of course I'll help you get the cash infusion from your investor.  Just don't tell him Activision is in operation. You can tell him I have agreements will all my owners & partners to install the system when it is fully operational.

On the other hand, I don't want to continue our relationship one more day if you can't be 100% truthful with me at all times going forward!

If not, lets discontinue & call it a day.

It's your choice. Let me know.

David

*2. ActivisionTV*
*Activision TV continues fine-tuning at Tropic Isle & SeaSide. It is not going as fast as I expected, however, it is a very complex system & I thought the project would be further along by now. I remain cautiously optimistic, however, we are not going to install this system in Tortuga until it is completely operational.*

*Wi-Fi upgrade is important!*
*In the meantime, we must increase our Wi-Fi bandwidth with BrightHouse & add a control-distribution box into each apartment.  Wi-Fi is a very important service we provide our guests & I'll come back to you with an exact amount it will cost for the labor & materials.  It will be a lot of money. The added service only adds about $400 per month divided by 55 apartments.*

David Teitelbaum
Anna Maria Island Resorts
115 Third Street South
Bradenton Beach, FL 34217
Office: (941) 778-0156
Cell:   (941) 812-4226
Fax:    (941) 778-5210
Anna Maria Island Market Report 3/31/13
http://www.AnnaMariaIslandResorts.net
http://www.AnnaMaria-RealEstate.com
http://www.TeitelbaumDevelopers.com
http://annamariaislandresorts.net/wp/amir-real-estate/2013-national-real-estate-conference/

# EXHIBIT 3

**From:** lockecgi@aol.com🔗
**Subject:** Don Crowder
**Date:** April 15, 2013 3:19:08 PM EDT
**To:** david@annamariaislandresorts.net

2 Attachments, 647 KB

David,
Per our discussion on Saturday I am enclosing copies of the checks that were given to Don for installing the WIB's at Seaside and Trop Isle. We also have all of the receipts for the cables and cords. Regarding your comment about the couple that own a unit at Tortuga, I would like to remind you that they will NOT be able to install a system similar to ours without our permission. Three of our 135 lawsuits are against hotels that are infringing on our patents.

Let's remember here, you knew from the beginning of this project that this was a beta site. We wanted to have the opportunity to get it right, before we went to the public at large. I compensated you for this with stock options and discounts.

We hired a Lynx programer last week that lives in the State of Washington that is an expert in Lynx and is assisting Richard to work out the only software issues we have left, which is on the Bright House Network. Richard thinks they will have it worked out this week and then we are good to go and your system will be fully operational.

Furthermore, I am extremely concerned about Tom's comment regarding the QK. The system IS functional; it is not completed due to wiring that the QK is responsible for. Tom does not have all of the facts. There are around 100 rooms that the QK has to replace cut wiring, that was caused by the QK, before our install can happen. Their team is currently in the process of fixing this problem. We have been requesting them for over 6 months to fix this problem. They are just now working on it.

On another note, I would like Don's phone number as I would like to use him again to install the WIB covers.

 I need to think about everything in light of recent events.

   Dave

Add $5 a night to your bill: The Venetian and Palazzo up their resort fees (Las Vegas Sun) - 11 Apr 03:00          Page 1 of 2

## Hotel Online
News for the Hospitality Executive

Guestware    visit us at Guestware.com

### Add $5 a night to your bill: The Venetian and Palazzo up their resort fees (Las Vegas Sun)
By Ed Komenda, Las Vegas SunMcClatchy-Tribune Regional News

AMI000105

April 11--The reign of the resort fee continues.

This time it's a change at the Venetian and Palazzo, where resort fees have been upped from $20 to $25 a night.

But don't fret: there's a way out.

According to the Venetian website, the fees are not reflected in the total price quoted in a guest's reservation because patrons don't have to accept the fee.

"You may decline the Resort Fee and the services included in the fee at check-in or check-out," a description on the website reads. "If you decide to decline the Resort Fee, the services included in the fee are charged whenever you use them at regular prices."

The $25 fee includes use of the resort's fitness center, Internet access, boarding pass printing, unlimited local and toll-free calls, a newspaper and drink coupons.

Venetian and Palazzo officials did not immediately return a call for comment.

Increasing resort fees, for those who pay them, are a growing trend on the Strip.

After years of marketing no resort fees at its hotels, Caesars Entertainment rolled out a $25 resort fee March 1. Company officials said guests demanded the fees because they prefer to pay a package price over separate amenity fees.

The South Point also started charging a resort fee March 1.

Practically all of the Strip's hotels charge resort fees, but many hotels off-Strip and downtown remain fee free. In total, 59 local hotels charge fees of between $10 and $25, while 32 resorts offer fee-free stays.

———

(c)2013 the Las Vegas Sun (Las Vegas, Nev.)

Visit the Las Vegas Sun (Las Vegas, Nev.) at www.lasvegassun.com

Distributed by MCT Information Services

Don_Crowder.pdf (289 KB)

http://www.hotel-online.com/News/2013_Apr_11/k.FVG.1365791878-1.html                4/15/2013